# EXHIBIT B

Volume I      Exhibits 1 - 29      Pages 1 - 443
          UNITED STATES DISTRICT COURT
            DISTRICT OF MARYLAND

SUMMIT DNA, LLC,                    *
     Plaintiff,                     *   Civil Action No.
Vs.                                 *
                                    *   1:14-CV-1329(WDQ)
PROOVE BIOSCIENCES, INC.,           *
     Defendant,                     *
                                    *
BRIAN MESHKIN,                      *
     Defendant.                     *

------------------------------------

PROOVE BIOSCIENCES, INC.,           *
     Counterclaim-Plaintiff         *
     and Third-Party Plaintiff,*
                                    *
Vs.                                 *
                                    *
SUMMIT DNA, LLC,                    *
     Counterclaim-Defendant,        *
                                    *
GEORGE POWELL,                      *
     Third-Party Defendant.         *


          DEPOSITION of GEORGE POWELL
      Thursday, November 19, 2015 at 9:00 a.m.
              Summit DNA, LLC
          88 Stiles Road, Suite 103
          Salem, New Hampshire 03076
   ------ Jacqueline P. Travis, RPR, CSR ------
        A-PLUS COURT REPORTING SERVICES, LLC
          97 Central Street, Suite 403
          Lowell, Massachusetts 01826
          978-455-1522 ~ 978-455-1523

**George Powell**
**November 19, 2015**

```
APPEARANCES:


Representing the Plaintiff/Defendant in

Counterclaim, Summit DNA, LLC and George Powell:

     THE HEALTH LAW PARTNERS

     BY:  TIMOTHY BURKHARD, Esquire

     29566 Northwestern Highway, Suite 200

     Southfield, Missouri 48034

     248-996-8510 ~ Fax: 248-996-8525

     tburkhard@thehlp.com


Representing the Defendant/Plaintiff in

Counterclaim, Proove Biosciences, Inc. and Brian

Meshkin:

     SHOOK, HARDY & BACON L.L.P.

     BY:  KENNETH E. CHASE, Esquire

     1155 F Street, NW, Suite 200

     Washington, District of Columbia 20004-1305

     202-639-5606 ~ Fax: 202-783-4211

     kchase@shb.com
```

George Powell
November 19, 2015

```
                    I N D E X
Testimony of:                        Page(s)
GEORGE POWELL
By Mr. Chase                  5,426,434,439
By Mr. Burkhard                 414,433,438


                E X H I B I T S


Exhibit No.       Description          For I.D.
Exhibit  1    New Hampshire Corporate
              Division website printout,
              Summit DNA                   110
Exhibit  2    New Hampshire Corporate
              Division website printout,
              Summit Diagnostics           111
Exhibit  3    Summit Diagnostics, LLC
              website                      112

Exhibit  4    Summit DNA, LLC website      115

Exhibit  5    First Set of Interrogatories
              to Summit DNA, LLC           134
Exhibit  6    Response to First Set of
              Interrogatories to Summit DNA,
              LLC                          137
Exhibit  7    Sales Services Contract
              Agreement dated July 25, 2013   152

Exhibit  8    Sales Services Contract
              Agreement dated July 25, 2013   238
Exhibit  9    Email dated July 12, 2012    249
Exhibit 10    Line item reports           266
Exhibit 11    Email dated April 1, 2014   276
```

**A-Plus Court Reporting Services, LLC**
**978.455.1522**

**George Powell**
**November 19, 2015**

| | | | |
|---|---|---|---|
| Exhibit | 12 | List of Physicians/Practices | 312 |
| Exhibit | 13 | Email dated November 27, 2013 | 328 |
| Exhibit | 14 | Email dated April 5, 2014 | 336 |
| Exhibit | 15 | Proove Biosciences report dated January 1, 2013 to March 4, 2014 | 338 |
| Exhibit | 16 | Email dated March 28, 2014 | 340 |
| Exhibit | 17 | Email dated March 3, 2014 | 345 |
| Exhibit | 18 | Email dated March 3, 2014 | 347 |
| Exhibit | 19 | Email dated February 23, 2014 | 348 |
| Exhibit | 20 | Genomind website | 352 |
| Exhibit | 21 | Email dated February 20, 2014 | 353 |
| Exhibit | 22 | Letter dated March 24, 2014 | 354 |
| Exhibit | 23 | Letter dated March 26, 2014 | 356 |
| Exhibit | 24 | First Set of Interrogatories to George Powell | 386 |
| Exhibit | 25 | Response to First Set of Interrogatories to George Powell | 387 |
| Exhibit | 26 | First Request for Production of Documents to Summit DNA, LLC | 387 |
| Exhibit | 27 | Response to First Request for Production of Documents to Summit DNA, LLC | 388 |
| Exhibit | 28 | Sales Representative Agreement dated December 12, 2013 | 419 |
| Exhibit | 29 | Email dated December 7, 2012 | 420 |

EXHIBITS APPENDED TO ORIGINAL TRANSCRIPT

George Powell
November 19, 2015

1    in things like Klonopin, Xanax.

2         Q.   Okay.   Okay.   So it would be a depressant

3    of the central --

4         A.   Antidepressant.

5         Q.   Antidepressant, but a depressant of the

6    central immune system?

7         A.   Not immune, but, again, I'm not a science

8    guy, but it's an antidepressant medicine.

9         Q.   People take it if they have depression?

10        A.   Yes.

11        Q.   Xanax is sometimes prescribed to folks

12   having trouble sleeping or anxiety?

13        A.   Anxiety more likely.

14        Q.   All right.   So you are working for Calloway

15   Laboratories, 2003 to 2007.   You leave Calloway Labs

16   around 2007?

17        A.   I do.

18        Q.   Where did you go then?

19        A.   I started Summit Diagnostics.

20        Q.   Okay.   What were the circumstances of your

21   departure from Calloway?

22        A.   I got wind that there was a problem with

23   their ethical nature of business.

24        Q.   What was the nature of the problem?

**George Powell**
**November 19, 2015**

```
 1        A.   Now?

 2        Q.   Yes.

 3        A.   Yes.

 4        Q.   So from -- let me just get the timeline

 5   from 2007 to the present time.  Did you work for any

 6   other companies other than Summit Diagnostics?

 7        A.   No.

 8        Q.   Summit Diagnostics is who you are employed

 9   by?

10        A.   Yes.

11        Q.   And you are an owner?

12        A.   I am.

13        Q.   What other companies are involved with

14   Summit Diagnostics?

15        A.   There's no other companies involved with

16   Summit Diagnostics.  There are independent companies

17   that have their own tax ID's.

18        Q.   Okay.  Like what?

19        A.   Summit DNA.

20        Q.   Okay.  What else?

21        A.   G&D Realty.

22        Q.   G&D?

23        A.   Yup.  Realty.

24        Q.   Okay.  What else?
```

George Powell
November 19, 2015

1        A.   Yes.

2        Q.   And that's through the present time?

3        A.   Maria's deceased.

4        Q.   Okay.  So George Powell, Matt Powell, Lori

5    Powell, Sheila Wood, Christine Ready, Laura Ring,

6    all employed by Summit Diagnostics, LLC?

7        A.   That's correct.

8        Q.   Okay.  And Mr. Hlavachek as well?

9        A.   He is not an employee.

10       Q.   He is not an employee?

11       A.   No.

12       Q.   Are you not an employee or are you an

13   employee and an owner?

14       A.   I am.

15       Q.   And Hlavachek is just an owner, not an

16   employee?

17       A.   Right.

18       Q.   And all of the people that I just mentioned

19   there, with the exception of Hlavachek, are employed

20   by Summit Diagnostics?

21       A.   That's correct.

22       Q.   And Summit Diagnostics, LLC is the entity

23   that writes the checks?

24       A.   That's correct.

```
 1        A.   I'm not in the sales function of that so,

 2   but there is a Summit DNA published number.

 3        Q.   And you don't know what that is?

 4        A.   No.  I can get that for you though.

 5        Q.   What is the Summit Diagnostics number?

 6        A.   800-377-6481.

 7        Q.   Okay.  Why don't we take a break.

 8        A.   Okay.  Thanks.

 9             (Recess was taken at 10:25 a.m.)

10             (Reconvened at 10:40 a.m.)

11        Q.   (By Mr. Chase)  Were you able to figure out

12   the Summit DNA phone number?

13        A.   Oh, I didn't check.  I can check by the end

14   of the day here.

15        Q.   Okay.  Who answers the phones for Summit

16   DNA?

17        A.   Everybody in the office does.

18        Q.   The same people that answer the phones for

19   Summit Diagnostics?

20        A.   Yes.

21        Q.   Does Summit DNA have an Intranet provider?

22        A.   Yes, they do.

23        Q.   Whose that?

24        A.   GoDaddy.
```

**George Powell**
**November 19, 2015**

1      A.   Chris Lowery.

2      Q.   How do you spell that?

3      A.   L-O-W-E-R-Y.

4      Q.   C-H-R-I-S?

5      A.   Yes.

6      Q.   Okay.  Who were the six or seven

7 independent contractors that John Warner supervised?

8      A.   Carolyn Rutherford, Nancy Williams, Bao

9 Ngo, N-G-O, Adam Fairborn.  There are a few others

10 and I can't think of them off the top of my head.

11      Q.   Okay.

12      A.   Brian Bass.

13      Q.   Are these individuals employed by John

14 Warner's company?

15      A.   No.

16      Q.   Are they all on their own?

17      A.   All on their own.

18      Q.   And they received payments through John

19 Warner or through Summit DNA?

20      A.   No, through Summit DNA.

21      Q.   And they received 1099s?

22      A.   That's correct.

23      Q.   Did these individuals -- by individuals I

24 mean Warner, Rutherford, Williams, Ngo, Fairborn,

**George Powell**
**November 19, 2015**

```
 1   Bass, have they ever received a 1099 from Summit

 2   Diagnostics?

 3        A.  They have.

 4        Q.  So they also do work for Summit

 5   Diagnostics?

 6        A.  They can, yes.  It's not their focus,

 7   though.

 8        Q.  Are any of them still receiving payments

 9   from Summit Diagnostics?

10        A.  Most of them are not here anymore.

11        Q.  Where were these individuals located?

12        A.  They're all over the country.

13        Q.  Where's Rutherford located?

14        A.  I believe she's in Oklahoma or Arkansas.

15   Somewhere down that way.

16        Q.  Williams?

17        A.  Oklahoma.

18        Q.  Ngo?

19        A.  Bao Ngo, N-G-O?

20        Q.  Right.

21        A.  He's Hawaii.

22        Q.  Fairborn?

23        A.  Texas.

24        Q.  Bass?
```

**George Powell**
**November 19, 2015**

1    A.   Missouri, I believe.

2    Q.   Have you met all these people?

3    A.   I have.

4    Q.   Where have you met them?

5    A.   Here.

6    Q.   They all came to New Hampshire?

7    A.   They've been here, yes.  Or I traveled with

8  them.

9    Q.   Did you know any of these individuals

10  before 2011?

11   A.   No.

12   Q.   Did you meet them all through John Warner?

13   A.   No.

14   Q.   How did you meet them?

15   A.   We put in ads for independent contractors

16  and they applied.

17   Q.   What commission do they receive?

18   A.   They get a commission based on what we

19  receive.  A percentage.

20   Q.   What percentage?

21   A.   Fifty percent.  That has changed through

22  time.  It's gone from 30 to 50 percent.

23   Q.   What about Warner, what is his arrangement?

24   A.   Warner got an override on everybody else.

George Powell
November 19, 2015

```
1        Q.  He didn't get a percentage, he got a

2   percentage of what everyone else earned?

3        A.  Right.  And he also had a sales contract,

4   so he could sell in North Carolina.  He could get

5   that percentage on an override.

6        Q.  What was the scope of payments that were

7   sent over the course of the work that these

8   individuals did?

9        A.  Varied from month to month, depending on

10  what we received.

11       Q.  Let's say an annual amount of money that

12  was paid to these individuals.

13       A.  Probably not more than 50,000.

14       Q.  50,000 at most?

15       A.  Maybe less.  Probably 50,000 total.

16       Q.  For all these people?

17       A.  I don't think it was very much.

18       Q.  So an average of less than 10,000 per

19  person?

20       A.  I would say so.

21       Q.  And that includes Warner?

22       A.  Warner didn't make very much money.

23       Q.  Okay.  So total for all sales individuals

24  that were doing sales for Summit DNA was less than
```

George Powell
November 19, 2015

1    50,000 a year?

2        A.   Probably more than that.  But, again, I

3    have to look at the statistics to say.  I mean, each

4    one of them -- you couldn't get statistics because

5    there was never -- it's hard to say, without looking

6    at their stats.

7        Q.   When you say statistics, Summit DNA, your

8    company issued them 1099s?

9        A.   But I don't memorize every 1099.

10       Q.   But you have access to get those 1099s if

11   you wanted to?

12       A.   Yeah, absolutely.

13       Q.   And so total amount paid, this would be

14   between 2011 and 2014, was it around 50,000 per

15   year?  Was it less?  What was the total amount paid

16   to --

17       A.   To each individual?  It was probably -- I

18   would say probably less than 25,000.

19       Q.   So less than 25,000 per person for the

20   whole scope of the engagement?

21       A.   Probably, yeah.

22       Q.   Okay.  So not a large engagement at all?

23       A.   No.

24       Q.   And did Summit DNA make money?  Was there

George Powell
November 19, 2015

1      Q.   All right.   Then after March of 2013, who

2  else?

3      A.   I'm sorry, we had one with AIBio.

4      Q.   AIBioTech?

5      A.   Yeah, prior to.

6      Q.   Prior to March of 2013?

7      A.   Uh-huh.

8      Q.   And after March of 2013, who else?

9      A.   After that we had Proove.

10     Q.   Okay.

11     A.   Genomind.

12     Q.   Uh-huh.

13     A.   I can't remember some of these companies'

14  names.  P3, I think it is, or something like that.

15     Q.   Anything else?

16     A.   That's it.

17     Q.   That's it.   The Genelex contract started in

18  what year?

19     A.   2008.   That's the one we dabbled with that

20  we couldn't get any money from, so.   But that was

21  with Summit Diagnostics.

22     Q.   That's Summit Diagnostics.

23     A.   And Genomind and P3 are with Summit

24  Diagnostics.

**George Powell**
**November 19, 2015**

```
 1        Q.   All right.  2008 to '08?

 2        A.   Uh-huh.

 3        Q.   General Genetics Corp, what years was that?

 4        A.   2009 to 2010.

 5        Q.   And it ended in 2010?

 6        A.   Yeah.

 7        Q.   Okay.  Harmonyx?

 8        A.   I think it was 2010.

 9        Q.   2010 to when?

10        A.   Very short.  That was the short one.

11        Q.   Okay.  Iverson?

12        A.   That went for a while.  That was probably

13   about eight months.  I think we were up to 2011.

14   Yeah, 2011, 2012.

15        Q.   Natural Molecular?

16        A.   Very short.  Maybe a month in 2012.

17        Q.   And AIBioTech?

18        A.   That ended in 2012.  That was like -- I

19   think it was started in 2012 and ended in 2012.

20        Q.   Okay.  Proove?

21        A.   We started talking in 2012, in the fall,

22   and then the end date was whatever the termination

23   of it was.

24        Q.   March 2014?
```

**George Powell**
**November 19, 2015**

1    started.

2         Q.   Not prior to Summit DNA starting, because

3    Genomind was through Summit Diagnostics in 2013.

4         A.   Right.

5         Q.   So Summit Diagnostics was doing DNA work,

6    right?

7         A.   Yeah.

8         Q.   Why is that?

9         A.   We've always done that.  We always had

10   multiple branches of business and we have done DNA

11   in the past.  It started that way and it's gone back

12   that way.

13        Q.   No, you said that there's a separate

14   company for DNA, didn't you?

15        A.   There is a separate company for DNA.  Our

16   dedicated DNA line.  We don't have a dedicated DNA

17   line anymore.  So we have a DNA line to complement

18   our toxicology area.

19        Q.   Well, in March of 2013 there was a separate

20   company, was there not?

21        A.   There was.  There is.

22        Q.   Okay.  All right.  And in March of 2013

23   Summit Diagnostics entered into a DNA contract with

24   Genomind, correct?

George Powell
November 19, 2015

1       A.   Yes.

2       Q.   Why is that?

3       A.   We used it to complement our psychiatric

4   division.   Or psychiatric drug division.

5       Q.   And there was a separate company in 2012,

6   right, for DNA?

7       A.   Yes.

8       Q.   But yet Summit Diagnostics entered into DNA

9   contract with AIBioTech in 2012?

10      A.   We ended it with AIBioTech in 2012.

11      Q.   Ended it in 2012.   What year did you start

12   it?

13      A.   I think it was the same year.

14      Q.   Right.   So in 2012 there was a separate

15   company, yet Summit Diagnostics did a DNA contract

16   with AIBioTech?

17      A.   We always had it to complement our system.

18      Q.   Why?

19      A.   There was a demand for it.

20      Q.   What do you mean by to complement your

21   system?

22      A.   So most of the -- there was -- a lot of the

23   labs out there at this point, including Millennium,

24   that had divisions of DNA in their networks.   So

**George Powell**
**November 19, 2015**

```
1    equals affiliated in your view?

2         A.   That's what I look at, yeah.

3         Q.   Okay.  All right.  So was there any shared

4    marketing between Summit DNA and Summit Diagnostics?

5         A.   No.

6         Q.   No shared marketing?

7         A.   No.  Summit DNA had its own marketing.

8         Q.   Okay.  Did you hire anyone to market Summit

9    DNA?

10        A.   We had 1099 reps.

11        Q.   Right.  So just the people that you

12   mentioned before?

13        A.   Correct.

14        Q.   And those people, they were also working

15   for Summit Diagnostics, correct?

16        A.   Some were.

17        Q.   Was there a lot of crossover?

18        A.   Some crossover.

19        Q.   Who was working also for Summit

20   Diagnostics?  Was Ms. Rutherford?

21        A.   No.

22        Q.   Was Ms. Williams?

23        A.   Yes.

24        Q.   Okay.  Was Mr. Ngo?
```

**George Powell**
**November 19, 2015**

```
1        A.   Yes.

2        Q.   Was Mr. Fairborn?

3        A.   Yes.

4        Q.   Mr. Bass?

5        A.   Yes.

6        Q.   Mr. Warner?

7        A.   No.

8        Q.   So the only people that were solely on

9   Summit DNA were John Warner and Carolyn Rutherford?

10       A.   There were others.  Like I said, I don't

11  have the full list, but there's about seven or eight

12  people all together.

13       Q.   I've got a list of six.

14       A.   I have to pull the records.  Again, I don't

15  remember all their names.

16       Q.   Okay.  Did you have discussions with

17  Ms. Williams, Mr. Ngo, Mr. Fairborn, Mr. Bass about

18  the differentiation of Summit DNA and Summit

19  Diagnostics?

20       A.   They knew the difference.

21       Q.   Did you have discussions with them?

22       A.   Yeah, we did.

23       Q.   What were the discussions?

24       A.   We had a separate company set up for DNA.
```

George Powell
November 19, 2015

1       Q.   That's the fax.   Is there an 800 there?

2       A.   377-4681.

3       Q.   That's the number for Summit Diagnostics,

4  not Summit DNA?

5       A.   It's Summit Diagnostic's original number,

6  yes.

7       Q.   And there's a separate number for Summit

8  DNA?

9       A.   There's a local number for Summit DNA.

10      Q.   Does Summit DNA use an 800 number?

11      A.   It might use that number.   I don't know

12  whether we set it up -- it might have originally

13  gone to that number.

14      Q.   Okay.

15      A.   We were sharing resources basically.

16      Q.   You were sharing resources?

17      A.   Internally for phone calls.

18      Q.   What else were you sharing resources for

19  internally between Summit Diagnostics and Summit

20  DNA; for calls, for emails, what else?

21      A.   That was it, I believe.

22      Q.   Just calls and emails?

23      A.   I believe so.

24      Q.   And same personnel?

```
 1        A.  Same personnel.

 2        Q.  Internally, correct?

 3        A.  Yes.

 4        Q.  If you take a look at page 1 of 8, the

 5   third page there.

 6        A.  Which one?

 7        Q.  The third page, where it says page 1 of 8.

 8   I will show you.  Summit Diagnostics pain

 9   management.  Is that along the lines of drug

10   screening or is that more DNA screening?

11        A.  Drug screening.

12        Q.  Drug screening is pain management?

13        A.  Yes.

14        Q.  How so?

15        A.  You monitor their drug use by taking urine

16   toxicology tests.

17        Q.  How does that relate to pain management?

18        A.  You're monitoring their medication usage.

19        Q.  Okay.

20            MR. CHASE:  This is going to be Exhibit 4.

21            (Exhibit No. 4, marked; Summit DNA, LLC

22   website.)

23        Q.  What website is this?

24        A.  Summit DNA.
```

1   objective third party.

2        A.  It would be hard for me to do that since I

3   own both sites.

4        Q.  Okay.  You own both sites or are they owned

5   in the name of the individual companies?

6        A.  By the name of the individual companies.

7        Q.  Okay.

8        A.  I'm an officer in both.

9        Q.  Okay.

10            MR. CHASE:  Mark this as 5.

11            (Exhibit No. 5, marked; First Set of

12   Interrogatories to Summit DNA, LLC.)

13        Q.  Exhibit 5, I will represent to you, that

14   this is the set of interrogatories that were served

15   to Summit DNA, LLC.  Okay?  If you take a look at

16   page 2, can you read the definition of No. 1,

17   Summit, into the record?

18        A.  Under No. 1 definitions?

19        Q.  Yes.

20        A.  "When used in these discovery requests, the

21   terms you, your, and Summit shall refer to plaintiff

22   and counterclaim-defendant Summit, including without

23   limitation, any officer, agent, broker, servant,

24   employee, attorney, insurance company, investigator,

George Powell
November 19, 2015

1   driver, independent contractor, or other person or

2   entity associated with Summit."

3        Q.   Are you associated with Summit?

4        A.   Summit Diagnostics or Summit DNA?

5        Q.   This is Summit DNA, LLC.

6        A.   I am associated.

7        Q.   Are you associated with Summit Diagnostics?

8        A.   I am.

9        Q.   Okay.  So this would include you, correct?

10       A.   I'm sorry?

11       Q.   The definition of No. 1 one of Summit, you

12   would be associated with Summit, correct?

13       A.   Summit DNA?

14       Q.   Correct.

15       A.   Yeah, Summit DNA.

16       Q.   Is Summit Diagnostics associated with

17   Summit DNA?

18       A.   No.  It's different.  It's two separate

19   companies.

20       Q.   Are they associated with one another?

21       A.   They have a relationship with each other.

22       Q.   What is the relationship?

23       A.   They share selling situations with each

24   other.

George Powell
November 19, 2015

```
 1        Q.   What else do they share?

 2        A.   Office space.

 3        Q.   Okay.  And what else?

 4        A.   Personal resources.

 5        Q.   And what else?

 6        A.   I don't know anything else.

 7        Q.   A phone number?

 8        A.   Same 800 number, yeah.  Okay.

 9        Q.   And email addresses?

10        A.   Well, Summit DNA does not have an email

11   address.

12        Q.   What work is being done for Summit DNA by

13   you, by Lori Powell, Matthew Powell, Christine

14   Ready, it's all being done by Summit Diagnostics'

15   email addresses or people's own email addresses,

16   correct?

17        A.   Sure.

18        Q.   There's no SUMMITDNA.COM email address?

19        A.   No.

20        Q.   So they share email addresses, true?

21        A.   Yes.

22        Q.   They share power?  Is there like a portion

23   of this office --

24        A.   Electric power?
```

George Powell
November 19, 2015

1        Q.   Yeah.

2        A.   Yeah.

3        Q.   Is there a portion of this office that

4    cordoned off for Summit Diagnostics versus Summit

5    DNA?

6        A.   No.

7        Q.   So it's all shared, correct?

8        A.   Yes.

9        Q.   The lights, the electricity, the phones,

10   the administrative staff, it's all shared between

11   Summit Diagnostics and Summit DNA, correct?

12       A.   Yes.

13       Q.   The entire office space here?

14       A.   Yes.

15       Q.   Not a portion of the parking lot that's

16   different, correct?

17       A.   No.

18       Q.   The whole thing is all shared?

19       A.   Yes.

20       Q.   Okay.

21            MR. CHASE:   Let's go to Exhibit 6.

22            (Exhibit No. 6, marked; Response to First

23   Set of Interrogatories to Summit DNA, LLC.)

24       Q.   Have you ever received Exhibit 6?  Have you

**George Powell**
**November 19, 2015**

1      A.  I can't remember at the time.  There's a

2  number of them there.  I have to go back and look at

3  the dates.  We talked about -- Iverson I believe was

4  one of them.

5      Q.  Okay.  That was 2011 to 2012.  Did that end

6  after October, November 2012?

7      A.  Natural Molecular.

8      Q.  Natural Molecular, you said a short one

9  month contract, 2012?

10      A.  Yes.

11      Q.  Which month was that?

12      A.  I mean, we had the contract.  We just

13  didn't do anything with them.  They got themselves

14  in some legal issues and that's why we pulled away.

15      Q.  AIBioTech, 2012.  Towards the end of 2012?

16      A.  Yeah, about October, November.  Somewhere

17  around there.

18      Q.  Okay.  And the contract -- okay.  So then

19  what happened?  There was some discussion about

20  exclusivity and you sent the draft of the contract

21  back in late 2012 to Proove?

22      A.  He actually sent me an email back saying he

23  understood.  Than he sent me back the contract and

24  it says non-exclusive.

**George Powell**
**November 19, 2015**

```
 1      Q.  He didn't say your concerns about
 2   exclusivity are all understood and therefore we
 3   changed the language?  He just said the word
 4   understood, correct?
 5      A.  Again, I have to look at it, but he knew my
 6   concerns about exclusivity and we wouldn't have
 7   signed an exclusive contract.
 8      Q.  Okay.
 9          (Exhibit No. 7, marked; Sales Services
10   Contract Agreement dated July 25, 2013.)
11      Q.  This is going to be Exhibit No. 7.  So is
12   it your understanding that it was a bilateral
13   non-exclusive contract?
14      A.  Yes.
15      Q.  Versus a unilateral non-exclusive contract?
16      A.  Correct.
17      Q.  Okay.  Did you read Exhibit 7?
18      A.  I did.
19      Q.  All right.  Was this the only version of
20   the contract that you signed?
21      A.  I believe so.
22      Q.  Okay.  And you did in fact sign Exhibit 7,
23   correct?
24      A.  I believe so.  Yes.
```

```
 1        Q.   Okay.  And did you read Exhibit 7?

 2        A.   I believe so.

 3        Q.   And that's the same 800 number that's on

 4   both the Summit DNA and the Summit Diagnostics

 5   website, correct?

 6        A.   Where's that number?

 7        Q.   Underneath your signature.

 8        A.   Yes.

 9        Q.   And this email address,

10   "POWELL.GEORGESUMMIT@GMAIL.COM," do you ever use

11   that email?

12        A.   POWELL.GEORGESUMMIT?  No, I don't use that

13   at all.

14        Q.   So why did you put that email address n

15   there?

16        A.   I think they put it on there.

17        Q.   Who's they?

18        A.   I wouldn't have put that on there.

19        Q.   Well, I mean, did someone just make up an

20   email address with --

21        A.   I have that email address, but I don't use

22   it.

23        Q.   Okay.  So it was you in fact that gave the

24   email address to them to put on the contract?
```

1      Q.   Is that what it says in the first

2  paragraph?

3      A.   Yup.

4      Q.   Okay.  So ISO is your side, correct?

5      A.   Uh-huh.

6      Q.   So page 4 of 12, there's a paragraph, the

7  fourth bullet point.  And the fourth bullet point

8  says "ISO shall be solely responsible for ensuring

9  any employees or independent representatives of ISO

10 comply with all terms of this agreement," correct?

11     A.   Correct.

12     Q.   Which would include any of the folks that

13 were working for both Summit Diagnostics and Summit

14 DNA, correct?

15     A.   Correct.

16     Q.   That would be Rutherford, Williams, Ngo,

17 Fairborn, Bass, correct?

18     A.   Correct.

19     Q.   And more.  You said six or seven.  I wrote

20 down five, so it could be more?

21     A.   Yes.

22     Q.   Take a look at the next page, page 5 of 12.

23 There's a paragraph called "Conflict of Interest."

24 Can you read that into the record?

**George Powell**
**November 19, 2015**

1      A.  On a broad sense, yes.

2      Q.  When you say "on a broad sense," let's talk

3   about the meaning of broad sense.  These companies

4   provide the same or similar service, correct?

5      A.  Uh-huh.

6      Q.  Okay.  As Proove, correct?  Yes?

7      A.  Yes.

8      Q.  In fact, this conflict of interest

9   provision provides that Summit DNA, meaning ISO,

10  shall not represent those other companies while it's

11  in this contract with Proove, correct?

12     A.  On a broad sense, yes.

13     Q.  Broad sense.  Right?

14     A.  That's like saying I'm a doctor.  What kind

15  of a doctor?  They're all different.

16     Q.  No.  Not different, because we talked about

17  the same or similar services with the Venn diagram.

18  So these companies are offering the same or similar

19  services.  Even if they offer some services that are

20  different, some are same or similar.  And ISO,

21  meaning Summit DNA, was not permitted to represent

22  those companies during the pendency of the contract

23  with Proove, correct?

24     A.  On the broad sense.

1          Q.   That's a yes?

2          A.   On a broad sense, yes.

3          Q.   In fact, Summit DNA did represent some of

4     those other companies during the pendency of the

5     contract with Proove?

6          A.   Yes.

7          Q.   Okay.  And that was in violation of the

8     conflict of interest provision?

9          A.   I disagree.

10         Q.   Well, we just talked about the fact that

11    the conflict of interest provision prevents Summit

12    DNA from representing companies that are competitors

13    of Proove, correct?

14         A.   They were well aware that we represented

15    other companies prior to the agreement.

16         Q.   That's fine.  My question, though, is this

17    contractual provision, whatever prior to the

18    agreement is water under the bridge.  This contract

19    happens in March of 2013, correct?

20         A.   March 2013.

21         Q.   Correct?  So as of March 2013 this contract

22    prevents Summit DNA from representing any of the

23    these other competitors, correct?

24         A.   I disagree.

George Powell
November 19, 2015

```
 1   portions to that, same or similar.  Don't just

 2   answer the question as to same.  Same or similar

 3   services.  Do you see that?

 4        A.   They offer DNA testing.  They both offer

 5   DNA testing.

 6        Q.   They both offer the same or similar

 7   services?

 8        A.   They offer DNA testing.

 9        Q.   That's a yes?

10        A.   They offer DNA testing.

11        Q.   So that's a yes?

12        A.   I'll say that they both offer DNA testing.

13        Q.   The answer to my question is yes?

14        A.   I'll say that they both offer DNA testing.

15        Q.   Okay.  So AIBioTech offers DNA testing,

16   correct?

17        A.   Yes.

18        Q.   Genomind does the same thing?

19        A.   They all do.

20        Q.   They all do and so does Proove?

21        A.   Yes.

22        Q.   All these companies offer the same or

23   similar services, correct?

24        A.   If you are looking from that broad sense,
```

George Powell
November 19, 2015

1     Q.   Sorry.   Summit Diagnostics had a contract

2   with AIBioTech, what is Summit DNA's role?

3     A.   Summit has a contract with AIBioTech up to

4   2012.   We hadn't branded the product yet.   We were

5   just learning the product.

6     Q.   Did you understand my question?

7     A.   I'm trying to.

8     Q.   My question is, Summit Diagnostics has a

9   contract with AIBioTech, what is Summit DNA's role?

10    A.   Summit DNA closes the deal.   They refer to

11  Summit DNA.

12    Q.   Okay.   So the deal is closed through Summit

13  DNA?

14    A.   Yeah.

15    Q.   Walk me through how that works.

16    A.   Summit DNA goes into an account and talks

17  to them about the particular products that they

18  have, and then makes that -- you know, gets the

19  doctor to agree to use the testing, and then they

20  start it up through Summit DNA.

21    Q.   Okay.   So all of the contracts that Summit

22  Diagnostics have that involved, anything involving

23  DNA, the deals can't be closed unless Summit DNA

24  comes in and closes the deal?

1      A.   Yes.

2      Q.   All right.  So when the contract's -- let's

3  say like the face of the contract is what, Summit

4  Diagnostics, Summit DNA's involved in that business,

5  right?

6      A.   As the referral to that company.  We're

7  keeping them separate.

8      Q.   But there's some involvement?

9      A.   Some involvement.

10      Q.   And that involvement would also be an

11  affiliation, would you agree?

12      A.   Some involvement, yeah.

13      Q.   That's an affiliation?

14      A.   Some affiliation, yeah.

15      Q.   There is an affiliation between Summit

16  Diagnostics and Summit DNA?

17      A.   Yeah.

18      Q.   Yes.  Okay.  Well, particularly with regard

19  to DNA testing, that is the affiliation, right?

20  That's the Venn diagram?

21      A.   There is a referral to the Summit DNA rep

22  that close it and that's it.

23      Q.   So these companies work right hand and left

24  hand, correct?

George Powell
November 19, 2015

1      A.  Huge amount of differences between Proove

2  and Genomind.  Nothing to Genomind, almost entirely

3  Proove.

4      Q.  Okay.  So there wasn't much business that

5  Summit Diagnostics or DNA did with Genomind?

6      A.  No.

7      Q.  Okay.  What about AIBioTech?

8      A.  Didn't have a contract with AIBioTech.

9      Q.  Did you ever?

10      A.  In 2012 we terminated the contract with

11  AIBioTech.

12      Q.  So you did have a contract with AIBioTech?

13      A.  In 2012, prior to Proove.

14      Q.  Okay.  And in 2012 prior to Proove did you

15  have a contract with AIBioTech?

16      A.  In 2012 we had a contract with AIBioTech.

17      Q.  What was the scope of business that Summit

18  did with AIBioTech?

19      A.  Negligible.

20      Q.  Negligible, like less than 50,000?

21      A.  Yes.

22      Q.  Total?

23      A.  Total.

24      Q.  Okay.  Less than 25,000?

George Powell
November 19, 2015

1       A.   Yes.

2       Q.   Less than 10,000?

3       A.   Probably.

4       Q.   Less than 5,000?

5       A.   I don't think so.

6       Q.   Between five and 10,000?

7       A.   I would stay around 5,000.

8       Q.   And 5,000, meaning that's how much was

9  received by Summit?

10      A.   Yes.

11      Q.   And you said it was Summit Diagnostics that

12  had the contract?

13      A.   That's correct.

14      Q.   With AIBioTech.  But in fact it was Summit

15  DNA that closed all the deals?

16      A.   No.  Not at that time.

17      Q.   So in 2012 when you had a contract with

18  AIBioTech, it was Summit Diagnostics that had the

19  contract with AIBioTech and Summit DNA's role was

20  what?

21      A.   Summit DNA's role wasn't anything at that

22  particular point.  We were developing an idea.

23      Q.   You already set up the company, right?

24      A.   We hadn't anything specific, so it was tied

**George Powell**
**November 19, 2015**

1   together.

2        Q.   When did you start -- when did you enter

3   into a contract with Genomind?

4        A.   I believe it was -- I don't recall the

5   date.  Sometime in July, I believe.

6        Q.   Right after you said to Mr. Meshkin that

7   Proove was Summit's partner?

8            MR. BURKHARD:  Object to the form,

9   foundation.

10       Q.   Following when you said to Mr. --

11       A.   A partner.

12       Q.   It was after you said to Mr. Meshkin that

13  Proove was -- we talked about your testimony, it was

14  our partner, not a partner.

15       A.   Our partner.

16       Q.   It was -- you said to Mr. Meshkin Proove is

17  our partner for DNA testing?

18       A.   Correct.

19       Q.   Summit went ahead and entered into a

20  contract with Genomind?

21       A.   Summit DNA or Summit Diagnostics?

22       Q.   You tell me.

23       A.   Summit Diagnostics.

24       Q.   And in this contractual scenario that

**George Powell**
**November 19, 2015**

```
 1        Q.   And it would refer business to Summit DNA,

 2   correct?

 3        A.   Correct.

 4        Q.   And then Summit DNA would go in and close

 5   the deal.  That's your testimony, correct?

 6        A.   Correct.

 7        Q.   Now, what lab was that applicable to?

 8        A.   Proove.

 9        Q.   Proove.  Okay.  So Summit Diagnostics

10   vis-`-vis Proove then would be --

11        A.   Summit DNA had the contract with Proove.

12        Q.   Okay.

13        A.   Summit DNA had the contract with Proove.

14   Summit Diagnostics had the contract with Genomind.

15        Q.   What was Summit Diagnostics' role vis-`-vis

16   Proove?

17        A.   Summit Diagnostics role with Proove?

18        Q.   Yeah.

19        A.   As a referral source.

20        Q.   Okay.  So Summit Diagnostics would then

21   refer business to Summit DNA for Summit DNA to

22   close?

23        A.   Correct.

24        Q.   And that was only vis-`-vis Proove?
```

**George Powell**
**November 19, 2015**

1        A.   Correct.

2        Q.   Okay.   But all the other companies that

3   Summit Diagnostics was doing business with didn't

4   involve Summit DNA?

5        A.   No.

6        Q.   Okay.   But Summit Diagnostics was involved

7   with Proove?

8        A.   Yes.

9        Q.   Right.   And they were trained, correct?

10       A.   They sat in on Brian's seminar.   They

11   weren't trained in depth.   This was ongoing training

12   after Brian's meeting once a week that Bruce Gardner

13   would continue to have that was Summit DNA reps.

14       Q.   That was reps that were both DNA and

15   Diagnostics?

16       A.   Yes.

17       Q.   How does one person stand in front of a

18   physician and then refer it to someone else if

19   that's the same person standing in front of the

20   physician?

21       A.   It's protocol.

22       Q.   Was it just who signed -- was it different

23   paperwork?

24       A.   It was different startup forms and

```
 1        Q.   Who's Carolise Belmont?

 2        A.   That's my national sales director.

 3        Q.   Did Carolise Belmont ever do any work for

 4   Summit DNA?

 5        A.   She did.

 6        Q.   She wore both hats?

 7        A.   Yeah.

 8        Q.   How would someone know if someone is

 9   communicating on behalf of Summit Diagnostics versus

10   Summit DNA if there is only one email address?

11        A.   You would talk about -- in the

12   conversations you would distinguish who was who.

13        Q.   So if there was an email that didn't

14   distinguish, how would someone know?

15        A.   It wouldn't be.

16        Q.   They wouldn't know.

17        A.   No.

18        Q.   Okay.  How about Genomind?

19             MR. BURKHARD:  Object to the form.

20        Q.   Did Summit Diagnostics have a contract with

21   Genomind in 2013?

22        A.   Yes, they did.

23        Q.   Okay.  And what was the nature of the

24   contract?
```

George Powell
November 19, 2015

1        A.   No.

2        Q.   How did Summit personnel know how to sell

3   Genomind products?

4        A.   The Summit Diagnostics managers went to

5   Pennsylvania for a day.

6        Q.   Who were those people?

7        A.   Myself, Matt Powell, Joe Powell, Carolise

8   Belmont, Chris Lowery, John Warner, John Meredith, I

9   believe Jennifer Sears.

10       Q.   Okay.   Those folks went to Pennsylvania to

11   speak with the Genomind people?

12       A.   Yes.

13       Q.   All right.   And that was for the purpose of

14   training?

15       A.   Yes.

16       Q.   When did the relationship with Genomind

17   start?

18       A.   I believe you asked me this before, I'm not

19   quite sure.   I think it might -- as far as the

20   relationship, do you mean a contract or do you

21   mean --

22       Q.   When did you first -- who did you first

23   make contact with at Genomind?

24       A.   I think it was John Johnson.

**George Powell**
**November 19, 2015**

```
1        Q.  Okay.  When?  What year?

2        A.  2013.  Probably in July of 2013.

3        Q.  So right before the contract was signed?

4        A.  It was before that.  I'm sorry.  I can't

5   remember, but it was sometime around that time.

6   Maybe like March, April, May.  Somewhere around

7   there.

8        Q.  So a couple months before the contract was

9   signed?  Not a significant amount of time.

10       A.  Somewhere around there.  I don't think we

11   actually went to see them until August or September.

12   We didn't do anything with them for quite a while.

13   There's not a lot of business to them.

14       Q.  How much business would you attribute to

15   Genomind?

16       A.  I think we went over this before too.  It

17   was very small.

18       Q.  So what did you get for a total scope of

19   business with Genomind?

20       A.  What kind of numbers are you looking for?

21   I'm not sure what you --

22       Q.  I'm looking for the numbers that are

23   correct ones.

24       A.  I don't know what you're looking for.  Are
```

1   you looking for specimen numbers, dollars?

2       Q.   Dollars.

3       A.   Under 5,000.

4       Q.   Okay.  And how much was AIBioTech?

5       A.   Less than that.

6       Q.   Okay.  So how about Harmonyx?

7       A.   Zero.

8       Q.   General Genetics?

9       A.   Maybe 10,000.  Somewhere around there.

10      Q.   And Iverson?

11      A.   I'd have to go back and look at that one.

12  We did have some significant volume there for a

13  while.  Not huge, but -- not like the Proove

14  numbers.

15      Q.   Okay.  So would you say less than 100,000?

16  50 to 100,000?

17      A.   Yeah.

18      Q.   Okay.  And Natural Molecular, that was one

19  month, so?

20      A.   We had one account there.  That was it.

21      Q.   I would say about zero.

22           And how much business -- how much money did

23  Summit DNA receive from Proove?

24      A.   Between 75 and 100,000.

**George Powell**
**November 19, 2015**

```
 1  you that the report format marketing piece that we

 2  sell that Proove is significantly different than

 3  anybody else.

 4      Q.  Okay.  So the basis of the defamation

 5  assertion is that you think it's not true that

 6  Summit Diagnostics has been marketing AIBioTech and

 7  Genomind?

 8      A.  I don't think it's any of the doctor's

 9  business what my company does.  And it was done to

10  damage my relationship with the doctor.

11      Q.  Okay.  Is it true that Summit Diagnostics

12  marketed AIBioTech?

13      A.  Summit Diagnostics marketed AIBioTech, yes.

14      Q.  Okay.  Is it true that Summit Diagnostics

15  marketed Genomind?

16      A.  Yes.

17      Q.  Is it true that Summit Diagnostics marketed

18  AIBioTech genetic testing?

19      A.  Yes.

20      Q.  Is it true that Summit Diagnostics marketed

21  Genomind testing?

22      A.  Yes.

23      Q.  Isn't that what it says in Exhibit 11?

24      A.  But it also says that I breached my
```

George Powell
November 19, 2015

1    contract.

2         Q.  Okay.  Well, you are aware that there's a

3    claim brought by Proove that Summit breached the

4    contract?

5         A.  It's not for public disclosure.

6         Q.  Okay.  But it's a public lawsuit?

7         A.  It's not for public disclosure.  It was

8    done intentionally to damage my relationship with

9    this particular physician's office.

10        Q.  Okay.  And which physician's office is

11   this?

12        A.  This is Barrett.  Barrett Medical

13   Consulting.

14        Q.  And who are they?

15        A.  They are physician, podiatrist in Phoenix,

16   Arizona.

17        Q.  How do you know Barrett?

18        A.  I know Barrett very well.  He's a friend of

19   mine.

20        Q.  How long have you known Barrett?

21        A.  Probably three years.

22        Q.  Who is the physician?  Is it --

23        A.  Stephen Barrett.

24        Q.  Stephen Barrett.  And who is Susan Doherty?

**George Powell**
**November 19, 2015**

1      A.   Susan Doherty is his director of the

2  center, or was.  I don't know if she still is or

3  not.

4      Q.   So the people that receive the email from

5  Mr. Meshkin or from Proove were Stephen Barrett and

6  Susan Doherty, correct?

7      A.   Correct.

8      Q.   Is Stephen Barrett still your friend?

9      A.   Yes.

10     Q.   When was the last time that you talked to

11 him?

12     A.   Maybe a year -- probably six months ago.

13     Q.   Okay.  How do you communicate with Stephen

14 Barrett?

15     A.   Email.

16     Q.   You email him.  Okay.  Was he the --

17     A.   Or phone call.

18     Q.   And it was actually Ms. Doherty that

19 forwarded you the email?

20     A.   Correct.

21     Q.   Okay.  And has your reputation been damaged

22 in the eyes of Stephen Barrett?

23     A.   I feel so.

24     Q.   Although he is still your friend?

**George Powell**
**November 19, 2015**

```
 1        A.   Professionally.

 2        Q.   Okay.  Was he a better friend before?

 3        A.   I don't think that has a bearing on

 4   anything.

 5        Q.   Okay.  So did you do business with Stephen

 6   Barrett?

 7        A.   I did.

 8        Q.   Okay.  When did you first start doing

 9   business with Stephen Barrett?

10        A.   We became friends after we started doing

11   business.

12        Q.   So when did you start doing business?

13        A.   Three years ago.

14        Q.   Okay.  And that would be 2012?

15        A.   Beginning of this contract.  2013 is when

16   we met him.

17        Q.   Through Proove?

18        A.   We met him marketing Proove products.

19        Q.   Okay.  So you met him marketing Proove.

20   And who was the sales rep that made contact with

21   Dr. Barrett?

22        A.   It's a rep down in Arizona.  I cannot

23   remember her name for the life of me.

24        Q.   Not one of the five or six we talked about?
```

George Powell
November 19, 2015

1    regard to this particular practice.

2         Q.  So Proove is correct to say, and

3    Mr. Meshkin is correct to say that Summit

4    Diagnostics has been marketing AIBioTech and

5    Genomind genetic testing, correct?

6         A.  Correct.

7         Q.  That's a true statement?

8         A.  Absolutely.

9         Q.  You completely agree.  You say, though,

10   that that is not in violation of the contract?

11        A.  Agreed.

12        Q.  But isn't there a kind of disagreement

13   about that?

14        A.  Maybe on your end.

15        Q.  Right?  Yeah, right?  Around some folks

16   saying -- involved in this lawsuit and some folks

17   disagreeing with you?

18        A.  Which folks?

19        Q.  The folks on the other side of the lawsuit.

20        A.  Your folks, yeah.

21        Q.  Right.  So are you saying that Mr. Meshkin

22   knew that the contract was only with DNA and thought

23   that diagnostics was a separate company?

24        A.  He knew that.

George Powell
November 19, 2015

```
1        Q.   He knew that?

2        A.   Absolutely.

3        Q.   And you testified earlier that you never

4   told him that?

5        A.   He had been here and he has sat through, he

6   knew that we had two different divisions.  He was

7   absolutely aware of that.

8        Q.   All right.  Did he think that Summit

9   Molecular was a third division?

10       A.   I don't know.

11       Q.   Did you ever introduce Molecular as a

12  division?

13       A.   No.

14       Q.   Why were you doing business as Summit

15  Molecular with Genomind?

16       A.   The way it was set up with the contract, it

17  was an old contract, like I said before.

18       Q.   Was it kind of grandfathered?

19       A.   Never really revised it.

20       Q.   Okay.  So there wasn't an intent to make

21  that a separate division?

22       A.   No.

23       Q.   It was just grandfathered?  Just random?

24       A.   Uh-huh.
```

George Powell
November 19, 2015

1      Q.  Okay.  How much damage do you think that

2   you sustained based on this email?

3      A.  I lost every single rep, I lost

4   credibility, lost time.  I can't put a dollar value

5   on it.

6      Q.  I'm talking about the email.  The email

7   that was sent to Mr. Barrett.

8      A.  I think it's pretty substantial.  It

9   doesn't make me look good.

10      Q.  Okay.  Mr. Barrett was a source of how much

11   business for Summit?

12      A.  Not very much.  But that's not the dollar

13   value I'm looking at here.

14      Q.  In the time that, the three years you've

15   known Mr. Barrett, how much business has he done

16   with Summit?  You said less than a couple thousand?

17      A.  5,000 maybe.

18      Q.  5,000.  Okay.  And that was all through

19   Proove, right?

20      A.  No, he had toxicology as well.

21      Q.  Okay.  So of the 5,000, how much was the

22   DNA, how much was the tox?

23      A.  I don't know.  I would have to look at the

24   statistics.

**George Powell**
**November 19, 2015**

1     Q.  50/50?

2     A.  I don't know.

3     Q.  But some portion of it was Proove?

4     A.  Yes.

5     Q.  So now that Summit is not doing business

6 with Proove, and this is after the contract was

7 over, March 2014?

8     A.  Yes.

9     Q.  March 28th, this is after you accepted the

10 contract's cancellation, correct?

11     A.  Did I accept the termination?

12     Q.  Yes.

13     A.  Not willingly.

14     Q.  But it was terminated?

15     A.  It was terminated, yeah.

16     Q.  And so in fact it's a true statement that

17 Summit terminated the contract, correct?

18     A.  That Summit terminated.

19     Q.  Sorry, that Proove terminated the contract?

20     A.  Proove terminated the contract.

21     Q.  So it's not incorrect to say that Proove

22 terminated the contract with Summit?

23     MR. BURKHARD:  Object to the form.

24     A.  Proove terminated the contract.

1      Q.  So if Mr. Meshkin said "Thus, we have

2  terminated our contract," that is a true statement?

3      A.  Yes.

4      Q.  Okay.  And they are seeking legal actions

5  and related damages -- in fact there was a counter

6  claim filed by Proove, correct?

7      A.  I believe this was prior to that though.

8      Q.  And you received a letter from Proove

9  stating that Proove was going to file a lawsuit?

10      A.  May.

11      Q.  May.  Okay.  Seeking legal action.  Is that

12  not consistent with may file a lawsuit?

13      A.  I don't think that's consistent.  I think

14  it's been used as a tool to damage reputation.

15      Q.  So you're stating that a letter informing

16  Summit from Proove saying that we may file a

17  lawsuit, that is inconsistent with seeking legal

18  action?

19      A.  I think involving a client is ir-repairable

20  damage.  I don't think it's necessary.

21      Q.  Has your reputation with Mr. Barrett been

22  irreparably damaged?

23      A.  I don't think it's as strong as it was

24  once.  I don't see him as much as I used to when I

1    Q.  You got forwarded the email within a couple

2  days?

3    A.  I would say so, yeah.

4    Q.  The email, Exhibit 11, indicates that --

5  Exhibit 11 indicates you were informed of this

6  email.  What did you do next?

7    A.  I don't recall, other than talk to him and,

8  yeah, we were terminated and, you know, if you want

9  to move your business, if you want to stay with us,

10  you can.  If not, you can stay with Proove.

11    Q.  Okay.  What did Dr. Barrett state?

12    A.  I don't think I'm going to be testing any

13  more.

14    Q.  All right.  Did you say well, we also have

15  Genomind?

16    A.  Genomind wouldn't fit him.  It's not the

17  right program for him.

18    Q.  Genomind didn't do toxicology?

19    A.  No.

20    Q.  You didn't have any other --

21    A.  Nobody does toxicology.

22    Q.  I understand Proove didn't do toxicology,

23  you were still doing the toxicology work with him,

24  right?

1     reason why we can't, how about that?

2              MR. CHASE:  Off the record.

3              (An off-the-record discussion was held.)

4         Q.   (By Mr. Chase)  So off the record we talked

5     about some discovery matters, and the reason we

6     talked about them is because there's a list of

7     providers, and what I wanted to ask Mr. Powell about

8     was which sales rep correlated to the account, how

9     many specimens are in each account, how much money

10    was received as it relates to each account, where

11    this 7,900 or some other number out there, how you

12    tie it to these providers, correct?

13        A.   Yes.

14        Q.   That's what we were talking about.  And I

15    also wanted to know, is this list of 75 the entire

16    scope or are there more?

17        A.   I'll find out.

18        Q.   Okay.  Fair enough.  And I mean, I'm asking

19    you, you're --

20        A.   We'll find out.

21        Q.   You're the owner?

22        A.   Absolutely.

23        Q.   Isn't it your testimony that there were

24    defamatory statements stated by Mr. Meshkin to

1    A.   I don't think I ever said they didn't know

2  what they were doing.   I never said what they were

3  doing, they were doing right.   They just didn't do

4  it in a timely way and the service wasn't very good.

5    Q.   You've always been neutral or glowing?

6    A.   Not now.   Not really now.   But, you know,

7  during the time that we were trying to make things

8  work, yeah, very much so.   In fact, I smooth a lot

9  of areas over to try to keep it going.

10    Q.   Right.   And so you were always -- you never

11  said anything bad about Proove?

12    A.   I probably have.

13    Q.   Okay.   So the same statement that you're

14  suing Mr. Meshkin for, defamation, you kind of done

15  the same thing, right?

16    A.   No.   I didn't say they breached their

17  contract?

18    Q.   You never said Proove breached the

19  contract?

20    A.   Not with me at this -- I dont' think they

21  breached the contract.

22    Q.   You never told anyone that Proove breached

23  the contract?

24    A.   I don't think I told that or not.   I can't

1    recall.

2         Q.   You can't recall whether you ever said to

3    anyone that Proove --

4         A.   During the time of the contract?

5         Q.   At any point.

6         A.   I don't think that's been in my repertoire

7    at all.  I may have said it once or twice.

8         Q.   Are you aware that your lawyers sued Proove

9    for an alleged breach of contract?

10        A.   I'm saying that they -- I don't remember

11   saying it to Bao Ngo or Adam Fairborn or anybody

12   like that.

13        Q.   Right.  You said it to Dr. Barrett or other

14   people, right?

15        A.   I would say that if anybody would have been

16   in breach, it would have been them, because they

17   terminated our contract.

18        Q.   You said the same thing to Dr. Barrett that

19   Mr. Meshkin said to Dr. Barrett?

20             MR. BURKHARD:  Object to the form and

21   foundation.

22        A.   In response --

23             MR. BURKHARD:  Listen to the question he

24   asked you.

```
 1        Q.  Are they identified in your interrogatory

 2   answers?

 3        A.  I don't know who this is.

 4             MR. CHASE:  Let the record reflect I want to

 5   move to strike this entire count of the complaint or

 6   the amended complaint.

 7             Off the record.

 8             (An off-the-record discussion was held.)

 9             (Recess was taken at 3:57 p.m.)

10             (Reconvened at 3:59 p.m.)

11        Q.  (By Mr. Chase)  Let's take a look at --

12   just mark these here.

13             (Exhibit No. 19, marked; Email dated

14   February 23, 2014.)

15        Q.  Exhibit 19, do you recognize this?

16        A.  I do.

17        Q.  This is an email from you to who?

18        A.  I believe this went to my sales group.

19        Q.  Okay.  But the only person that is in the

20   to field is you and Lori Powell6627?

21        A.  That's my wife.

22        Q.  Your wife.  Does Ms. Powell, she work for

23   Summit?

24        A.  She does.
```

1        Q.   Which company does she work for?

2        A.   Summit Diagnostics.

3        Q.   Summit Diagnostics.  Okay.  Is she involved

4   in Summit DNA?

5        A.   Only on the aspect of putting accounts in.

6        Q.   Okay.  So doesn't get a separate paycheck

7   from Summit DNA?

8        A.   No.

9        Q.   All the people that work for both Summit

10  Diagnostics and Summit DNA, nobody gets paid by

11  Summit DNA, correct?

12            MR. BURKHARD:  I object to the form.

13       Q.   All the people that are employees of Summit

14  Diagnostics, none of them receive any money from

15  Summit DNA?

16       A.   Employees, no.  They do not.

17       Q.   Who else is copied on, BCC to people?

18       A.   I don't know where this went.  It may have

19  just gone to her for editing.  I'm not sure.  And

20  probably went out afterwards.  Back to Carolise.

21       Q.   This is marketing AIB, which is AIBioTech,

22  right?

23       A.   Uh-huh.

24       Q.   This is about a month before Proove

**George Powell**
**November 19, 2015**

```
 1        Q.   You have been to the Genomind website?

 2        A.   Yeah, once or twice.

 3        Q.   So that's a yes?

 4        A.   Yes.

 5             (Exhibit No. 21, marked; Email dated

 6   February 20, 2014.)

 7        Q.   Take a look at 21.  That's that same

 8   graphic from the Genomind website, right?

 9        A.   Uh-huh.

10        Q.   And there's Carolise Belmont sending an

11   email from -- what is the name of her email?

12        A.   Gmail.com.

13        Q.   What's to the left of her name?

14        A.   Summit Diagnostics.

15        Q.   Is she sending -- is Ms. Belmont sending an

16   email on behalf of Summit Diagnostics?

17        A.   Yes.

18        Q.   Who is the email to?

19        A.   I believe that's the sales force.

20        Q.   Okay.  Is Summit Diagnostics' marketing

21   Genomind here?

22        A.   Yes, it is.

23        Q.   Is there any separation between Summit

24   Diagnostics and Summit DNA?  Is there like a
```

George Powell
November 19, 2015

```
 1   disclaimer on the bottom that says Summit

 2   Diagnostics is separate from Summit DNA?

 3        A.  No.

 4        Q.  Why is that?  Why didn't you have that

 5   differentiation?

 6        A.  I didn't think we need to.  Two different

 7   companies.

 8        Q.  Okay.

 9            (Exhibit No. 22, marked; Letter dated March

10   24, 2014.)

11        Q.  Here's 22.  Have you seen this document

12   before?

13        A.  Yes.

14        Q.  Okay.  And this is dated March 24th, 2014,

15   correct?

16        A.  Correct.

17        Q.  And this is before Mr. Meshkin sent an

18   email to Dr. Barrett, correct?

19        A.  I believe so, yeah.

20        Q.  In the letter Mr. Meshkin states "The

21   company," as in Proove, "hereby effectively is

22   terminating its contract with Summit and will

23   explore legal action to recoup funds paid to Summit

24   subsequent to the documented material breach
```

**George Powell**
**November 19, 2015**

```
 1   amounting to over 75,000, plus damages," correct?

 2       A.  Yes.

 3       Q.  Did you send a letter back to Mr. Meshkin

 4   saying, Mr. Meshkin, I think you're thinking of the

 5   wrong Summit?  We have a different company that was

 6   marketing this company?

 7       A.  No.

 8       Q.  Why didn't you do that?

 9       A.  I contacted my attorney.

10       Q.  But did your attorneys ever send an email

11   to Mr. Meshkin trying to separate out the two

12   different companies?

13       A.  I don't recall.

14       Q.  You don't recall.  Did you ever say to

15   Mr. Meshkin hey, you got the wrong company?  I was

16   doing that through my other company?

17       A.  We had a conversation right here in the

18   back on the phone.  He was on a plane and I

19   explained to him -- he always had known that we had

20   relationships, because we go back to conversations

21   with Bruce Gardner, and he was in a rage and

22   infuriated.

23       Q.  So that's a yes.  Have you ever told

24   Mr. Meshkin that there are two different companies?
```

**George Powell**
**November 19, 2015**

1      A.   We covered this about four hours ago.  He

2   was here.  He knew there were two companies.  He

3   actually sat here and saw the logos on the front,

4   Summit Diagnostics, Summit DNA.  He actually saw

5   that here.

6      Q.   Did you comment on it?

7      A.   No.

8      Q.   How do you know that he noticed it?

9      A.   He walked right in.  He's a very smart guy

10   and he is very astute.

11      Q.   He didn't say anything to you about it?

12      A.   I didn't expect he would.

13      Q.   He is so smart and astute, why didn't he

14   say which company am I contracting with?

15      A.   That's something you have to ask him about.

16      Q.   Okay.  You can't testify to anything that

17   he said that would indicate that he said that?

18      A.   I can't say that he didn't either.

19      Q.   Did you see his eyes lock in with that

20   piece of marketing on the glass?

21      A.   No.

22           (Exhibit No. 23, marked; Letter dated March

23   26, 2014.)

24      Q.   This is Exhibit 23.  Have you seen this

**George Powell**
**November 19, 2015**

```
 1                    REDIRECT EXAMINATION

 2   BY MR. CHASE:

 3        Q.  Referring back to the contract, which is

 4   Exhibit 7.  There was some questions asked by

 5   Mr. Burkhard about Summit Diagnostics and some of

 6   the other folks there.  If you take a look at page

 7   4.  Wasn't there some overlap?  There's a bullet

 8   point indicating "ISO," meaning Summit, "shall be

 9   solely responsible for ensuring any employees or

10   independent representative of ISO comply with all

11   the terms of this agreement."  Some of the

12   independent representatives of Summit -- well, it's

13   your testimony that Summit DNA had no employees,

14   correct?

15        A.  Correct.

16        Q.  Okay.  So how can a company function

17   without any employees?

18        A.  As independent contractors.

19        Q.  Who is running the administration of the

20   company?

21        A.  I run the administration of the company.

22        Q.  But also the employees of Summit

23   Diagnostics, right?

24        A.  I do.
```