# EXHIBIT G

## SALES SERVICES CONTRACTOR AGREEMENT

This SALES SERVICES CONTRACTOR AGREEMENT ("Agreement") is dated as of July 25, 2013 (the "Effective Date") and is by and between **Summit Diagnostics, LLC d/b/a Summit Molecular**, a Delaware limited liability company and its successors or permitted assigns ("Contractor"), and **Genomind, LLC,** a Virginia limited liability company and its successors or permitted assigns ("Client"). Contractor and Client are generically referred to as a "Party" or the "Parties."

1. MARKETING SERVICES.

1.1 **Engagement of Services from Contractor**. Contractor shall render the marketing-related services set forth in the attached Exhibit A, which is incorporated herein by reference (the "Marketing Services"). The manner and means by which Contractor provides services to Client shall be in Contractor's sole discretion and control, subject to applicable law. Contractor shall (a) exercise the highest degree of professionalism in the furnishing of the Marketing Services, (b) be responsible to provide the infrastructure and personnel through which it shall furnish the Marketing Services at its sole expense, and (c) shall perform the Marketing Services in a timely and professional manner consistent with similarly situated consultants. Contractor shall not sub-contract or otherwise delegate its obligations under this Agreement, without Client's prior written consent, other than to or through an affiliate.

1.2 **Limited Nature of Contractor's Services**. By way of clarification, although Contractor is furnishing the Marketing Services to enhance the clinical efficacy and business components of Client's services, Contractor shall neither possess nor exercise any control or supervision over the provision of professional, technical or logistical services by, at or through Client. The parties acknowledge that Contractor is not authorized or qualified to engage in any activity that may be construed or deemed to constitute the practice of medicine or the performance of laboratory testing services. Contractor acknowledges that it is prohibited from providing marketing services on behalf of Client for patients whose care is covered by Medicare, Medicaid or TriCare. Contractor acknowledges that Client will not provide services to patients enrolled in Medicare, Medicaid, or TriCare. Contractor shall use its best efforts to ensure no samples of patients enrolled in such government programs are directed to Client for testing.

2. COMPENSATION. Client shall pay Contractor the fees set forth in attached Exhibit A for services rendered under this Agreement, which is incorporated herein by reference. If this Agreement is terminated by Contractor, or by Client (for any of the Client Immediate Termination Bases (as hereinafter defined)), Client shall pay Contractor fees owing for all services performed prior to the date of termination. Client shall pay Contractor all fees due and owing within thirty (30) days of the date of Contractor's invoice, or as otherwise mutually agreed upon by Contractor and Client. In addition to the foregoing, Contractor shall be entitled to "Continuing Fees" in accordance with the terms of Section 5.4(c)(x).

3. INDEPENDENT CONTRACTOR RELATIONSHIP. Contractor's relationship with Client will be that of an independent contractor and nothing in this

1797841.1

Agreement should be construed to create a partnership, joint venture, or employer-employee relationship. Contractor is not authorized to make any representation, contract, or commitment on behalf of Client not expressly authorized by Client. Contractor will not be entitled to any of the benefits that Client may make available to its employees, such as group insurance, profit-sharing or retirement benefits. Contractor will be solely responsible for all tax returns and payments required to be filed with or made to any federal, state or local tax authority with respect to Contractor's performance of services and receipt of fees under this Agreement. Client will regularly report amounts paid to Contractor by filing Form 1099-MISC with the Internal Revenue Service as required by law. Client will not withhold or make payments for social security; make unemployment insurance or disability insurance contributions; or obtain worker's compensation insurance on Contractor's behalf. Contractor agrees to accept exclusive liability for complying with all applicable state and federal laws governing self-employed individuals, including obligations such as payment of taxes, social security, disability and other contributions based on fees paid to Contractor, its agents or employees under this Agreement. Contractor hereby agrees to indemnify and defend Client against any and all such taxes or contributions, including penalties and interest.

4. CONFIDENTIALITY AGREEMENT.

4.1 **Confidentiality.** Notwithstanding anything to the contrary set forth herein, the Parties acknowledge that they are parties to a Contractor Confidentiality Agreement dated July 8, 2013 (the "Confidentiality Agreement"), and agree that their respective rights and obligations under the Confidentiality Agreement continue in full force and effect with respect to the Marketing Services to be provided hereunder and that such rights and obligations survive the expiration or termination of this Agreement for any reason.

4.2 **Patient Information.** Contractor shall not have access to any protected health information (as that term is defined in 45 C.F.R 160.103) under this Agreement.

5. TERMINATION.

5.1 **Term.** During the initial one (1) year term commencing on the Effective Date, the parties shall be permitted to terminate this Agreement solely for "good cause," meaning that the other party has materially breached a substantive obligation hereunder, and has not reasonably cured such breach within thirty (30) days of receipt of written notice of such breach. It is acknowledged and agreed that (a) Client shall be permitted to terminate immediately at any time in the case of a breach of any of the Client Immediate Termination Bases, and (b) Contractor shall be permitted to terminate immediately at any time in the case of a breach of any of the Contractor Immediate Termination Bases (as hereinafter defined). On and after the one-year anniversary of the Effective Date, this Agreement will automatically renew for subsequent one (1) year terms, unless terminated by either Party upon thirty (30) days written notice prior to the expiration of the then-current term (whether initial or renewal).

5.2 **Termination by Client or by Contractor.** Following the one-year anniversary of the Effective Date, Client may terminate this Agreement at any time upon thirty (30) days' prior written notice to Contractor. Client may also terminate this Agreement immediately upon Contractor's material breach of the Confidentiality Agreement or Section 5.3, Section 6.1(b)(i) or Section 7.9 hereof (the "Client Immediate Termination Bases").

CONFIDENTIAL                                                                                                SUMMIT-000793

Following the one-year anniversary of the Effective Date, Contractor may terminate this Agreement at any time upon thirty (30) days' prior written notice to Client. Contractor may also terminate this Agreement immediately upon Client's material breach of the Confidentiality Agreement or Section 5.3 or Section 6.2(d) hereof (the "Contractor Immediate Termination Bases").

    5.3    **Noninterference with Respective Businesses**.

        (a)    [Intentionally Omitted.]

        (b)    The Parties recognize that, in conjunction with Contractor's provision of the Marketing Services to Client, the Parties shall mutually benefit from their association with each respective Party's goodwill with third parties in Contractor's and Client's respective marketplaces.

        (c)    In recognition of each Party benefiting from the other Party's goodwill in the marketplace, the Parties agree to the following (i) continuing rights and obligations and (ii) restrictions on competitive behavior:

            (x)    For a period of one (1) year following this Agreement's termination by either Party for any reason (except in the case of termination by Client for any of the Client Immediate Termination Bases), Contractor shall be entitled to and shall promptly receive certain continuing fees ("Continuing Fees") as agreed to in Exhibit A. Client shall provide a monthly accounting of all such Continuing Fees throughout the twelve (12) month period following termination of this Agreement. The Continuing Fees during such 12-month period will based on the fees set forth in the table in Exhibit A for all specimens received from Contractor (in the case of pre-termination receivables) and all specimens received from Clients of Contractor (as hereinafter defined) during such 12-month period. The Parties acknowledge and agree that the Continuing Fees are intended to include, without limitation, receivables related to services performed by Contractor prior to any termination as well as business related to customers that were originated by Contractor prior to the termination of this Agreement.

            (y)    During the term of this Agreement and for a period of one (1) year following its termination by either Party for any reason, neither Party shall solicit, recruit, hire, induce or interfere in any manner with the other Party's relationship with any employee or independent contractor of the other Party as of the termination date of this Agreement; provided, however, that nothing herein shall be deemed to prevent a Party from hiring any such person who has responded to such Party's general solicitation for employees or employing any such person who contacts a Party on his or her own initiative without any direct or indirect solicitation by or encouragement from such Party.

            (z)    During the term of this Agreement and for a period of one (1) year following its termination by either Party for any reason, Client shall not attempt to induce, or induce, any third party that is a customer or client of Contractor that Contractor introduced to Client and that ordered a Psychiatric Genetic Test (as hereinafter defined) ("Clients of Contractor") to cease doing business with, or

CONFIDENTIAL    SUMMIT-000794

otherwise divert business from, Contractor. For purposes of this provision, the term "Psychiatric Genetic Tests" shall mean genetic tests that are used by clinicians to help inform patient responses to different psychiatric treatments.

6. REPRESENTATIONS AND WARRANTIES; AGREEMENTS.

**6.1 Representations and Warranties by Contractor.**

(a) Contractor hereby represents, warrants and agrees, to and with Client that Contractor shall make the following four (4) disclosures to any third party potentially receiving services from Client as a result of the services contemplated by this Agreement, with each such disclosure maintained by Contractor in a written record certifying such disclosure:

(i) The manner in which Contractor selected Client as a potential service provider;

(ii) Whether Client has paid Contractor a fee for such selection;

(iii) The nature of the relationship between Contractor and Client; and

(iv) The nature of any restrictions that would exclude Client from further dealings with the third party in the future.

(b) Contractor further represents and warrants to Client as follows:

(i) (x) neither Contractor nor any of its employees and agents is excluded under 42 U.S.C. §1320(a)-7 from participation under any federal health care program for the provision of items or services for which payment may be made under a federal health care program; and (y) no action has occurred or is pending or threatened against Contractor or to its knowledge against any employee, contractor or agent engaged to provide items or services that could result in such exclusion (collectively, "Contractor Exclusions/Adverse Actions"). During the term of this Agreement, Contractor agrees to notify Client in writing of any Contractor Exclusions/Adverse Actions within twenty-one (21) days of learning of any such Contractor Exclusions/Adverse Actions and provide the basis of the Contractor Exclusions/Adverse Actions. Contractor acknowledges that the exclusion of any personnel from participation in the Medicare or Medicaid programs shall result in his or her immediate removal from work on Contractor's duties and responsibilities under this Agreement. Contractor acknowledges and agrees that any unresolved Contractor Exclusions/Adverse Actions of or against it or any employee, agent or independent contractor utilized, directly or indirectly, in the performance of this Agreement may serve as the basis for the immediate termination of this Agreement by Client.

(ii) Contractor shall carry general liability insurance covering liability for claims, causes of actions, actions, losses, liabilities, damages, and expenses arising out of, caused by or otherwise resulting from the negligence or otherwise

CONFIDENTIAL                                                                                          SUMMIT-000795

wrongful acts or omissions of its employees and/or agents occurring while each is engaged in activities related to this Agreement. Said policies shall contain minimum limits of liability of one million dollars ($1,000,000) per occurrence and three million dollars ($3,000,000) in the aggregate, or as the Parties may otherwise mutually agree.

(iii)  Contractor shall indemnify and hold Client harmless from any claims arising out services provided by Contractor from any third party, including government entities (including any fees, costs, including, without limitation, attorneys' fees, expert witness fees and costs of court, and expenses associated with the defense against same).

6.2 **Representations and Warranties by Client.** Client represents and warrants to Contractor as follows:

(a) Client shall be solely responsible for directing the technical and/or logistical services provided by Client and shall be solely responsible for its day-to-day operations, including, but not limited to, the selection of all equipment and related supplies necessary to provide such services, development and application of technical algorithms for the production of results and/or reports in connection with the testing services performed by referring laboratories, general maintenance, protocols, data security, staffing (including, but not limited to, training, education, certification, credentialing, and privilege issues), and staffing supervision.

(b) Client shall be responsible for establishing and maintaining relationships with referring laboratories to the extent necessary for the performance of laboratory services and furnishing appropriate reports of test results to customers. This shall include, but is not limited to, ensuring the performance of all laboratory and/or testing services by such laboratories.

(c) Without limiting the generality of the foregoing Section 6.2(a), to the extent Client's services are deemed laboratory services or implicate laws applicable to such services, Client shall strive to ensure its employees and agents providing services that comply with any applicable standards of the Clinical Lab Improvement Act ("CLIA"), the Medicare Conditions of Participation, and all policies and procedures are in compliance with federal and state health and safety laws.

(d) (i) neither Client nor any of its employees and agents is excluded under 42 U.S.C. §1320(a)-7 from participation under any federal health care program for the provision of items or services for which payment may be made under a federal health care program; and (ii) no action has occurred or is pending or threatened against Client or to its knowledge against any employee, contractor or agent engaged to provide items or services that could result in such exclusion (collectively, "Client Exclusions/Adverse Actions"). During the term of this Agreement, Client agrees to notify Contractor in writing of any Client Exclusions/Adverse Actions within twenty-one (21) days of learning of any such

CONFIDENTIAL                                                                                                                   SUMMIT-000796

Client Exclusions/Adverse Actions and provide the basis of the Client Exclusions/Adverse Actions. Client acknowledges that the exclusion of any personnel from participation in the Medicare or Medicaid programs shall result in his or her immediate removal from work on Client's duties and responsibilities under this Agreement. Client acknowledges and agrees that any unresolved Client Exclusions/Adverse Actions of or against it or any employee, agent or independent contractor utilized, directly or indirectly, in the performance of this Agreement may serve as the basis for the immediate termination of this Agreement by Contractor.

(e) Client shall carry general liability and professional liability insurance covering liability for claims, causes of actions, actions, losses, liabilities, damages, and expenses arising out of, caused by or otherwise resulting from the negligence or otherwise wrongful acts or omissions of its employees and/or agents occurring while each is engaged in activities related to this Agreement. Said policies shall contain minimum limits of liability of one million dollars ($1,000,000) per occurrence and three million dollars ($3,000,000) in the aggregate, or as the Parties may otherwise mutually agree.

(f) Client shall indemnify and hold Contractor harmless from any claims arising out services provided by Client from any third party, including government entities (including any fees, costs, including, without limitation, attorneys' fees, expert witness fees and costs of court, and expenses associated with the defense against same).

7. MISCELLANEOUS.

    7.1    **Governing Law**. This Agreement will be governed by and construed in accordance with the laws of the Commonwealth of Virginia, notwithstanding the actual state of residence of Contractor. The Parties hereby expressly consent, however, to the personal jurisdiction of the state and federal courts located in New York for any action or proceeding arising from or related to this Agreement. The Parties hereby amend Section 13 of the Confidentiality Agreement to delete the second sentence thereof and to provide that the Parties hereby expressly consent to the personal jurisdiction of the state and federal courts located in New York for any action or proceeding arising from or related to the Confidentiality Agreement.

    7.2    **Severability**. If one or more of the provisions contained in this Agreement shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect the other provisions of this Agreement, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein. Notwithstanding the foregoing, a court of competent jurisdiction may reform any provision found invalid, illegal, or unenforceable in a manner consistent with the intent of the Parties so as render such provision fully enforceable to the extent permitted by law.

    7.3    **No Assignment**. This Agreement may not be assigned by either Party without the other Party's prior written consent.

CONFIDENTIAL    SUMMIT-000797

7.4     **Notices**. All notices, requests and other communications under this Agreement must be in writing, and must be mailed by registered or certified mail, postage prepaid and return receipt requested, or delivered by hand to the party to whom such notice is required or permitted to be given. If mailed, any such notice will be considered to have been given five (5) business days after it was mailed. If delivered by hand, any such notice will be considered to have been given when received by the party to whom notice is given.

7.5     **Injunctive Relief**. A breach of certain promises or agreements contained in this Agreement may result in irreparable and continuing damage to the non-breaching Party for which there may be no adequate remedy at law, and the non-breaching Party is therefore entitled to seek injunctive relief as well as such other and further relief as may be appropriate. For purposes of this Section 7.5, if a non-breaching Party seeks injunctive relief, the breaching Party shall waive any requirement of a bond or other security and shall be liable for reasonable attorney fees and costs incurred in enforcing the terms of this Agreement.

7.6     **Survival**. The following provisions shall survive termination of this Agreement: Section 2, Section 4, Sections 5.3 through 5.5, Section 6.1(b), Section 6.2 and Section 7, and Exhibit A.

7.7     **Waiver**. No waiver by a Party to this Agreement of any breach of this Agreement shall be a waiver of any preceding or succeeding breach. No waiver by a Party to this Agreement of any right under this Agreement shall be construed as a waiver of any other right. Neither Party shall be required to give notice to enforce strict adherence to all terms of this Agreement.

7.8     **Entire Agreement**. This Agreement and the exhibits attached hereto, constitute the final, complete and exclusive agreement of the Parties with respect to the subject matter hereof and supersede and merge all prior discussions between the Parties. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing and signed by the Party to be charged.

7.9     **Conduct in Accordance with Law**. Contractor shall conduct itself in accordance with the prohibitions set forth in 42 USC § 1320a-7b(b) (the "Anti-Kickback Law"), 42 USC §1395nn (the "Stark Act"), and all other applicable federal, state or local laws, rules, and/or regulations, third party reimbursement sources (public or private), or other reimbursement sources covering services. Contractor represents and warrants that it has not entered into this Agreement, with the intent to induce the referral of Medicare or Medicaid items or services to any party, person or entity, and has not unlawfully provided or received remuneration.

7.10    **Indemnity**. Each Party will indemnify, defend and hold the other Party and its respective officers, directors, members, managers, employees and agents harmless, from and against any liabilities, losses, damages, claims, judgments, fines, penalties, lawsuits and expenses, that the other Party suffers to a third party resulting from breach of this Agreement or violation of the law caused by its negligence or wanton acts or omissions.

CONFIDENTIAL                                                                                           SUMMIT-000798

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their duly authorized representative.

| "CLIENT" | "CONTRACTOR" |
|---|---|
| **GENOMIND, LLC**<br>**100 HIGHPOINT DRIVE, SUITE 102**<br>**CHALFONT, PA 18914** | **SUMMIT DIAGNOSTICS, LLC**<br>**P.O. BOX 743**<br>**LONDONDERRY, NH 03053** |
| By: *[signature]*<br>Printed Name: Michael Koffler<br>Title: SVP, CFO | By: *[signature]*<br>Printed Name: George L. Paul<br>Title: President |

## EXHIBIT A
## SERVICES AND COMPENSATION

### Services

Contractor's services include the following duties:

1. Establish new physician client sales of molecular lab service for processing by Client.
2. Ensure the ongoing in-person and phone customer service required to maintain Client base.
3. Provide ongoing training to representatives.
4. Provide training, support and payment for all independent representatives.
5. Provide consultation on the implementation of mechanisms to ensure the medical necessity and appropriateness of all testing.

Client shall be responsible for performing the following duties:

Provide molecular testing services for physician clinic provided specimens. Elements of this service include:

1. Ability to process and report results in a timely fashion.
2. Reporting will be available online or fax
3. Client services must be available to support clients from 9AM-5PM EST
4. Must be able to provide the standard minimal tools; lab reqs, supply order forms, shipping tools, etc.
5. Must provide designated supplies for collection and shipping
6. Client agrees to send a weekly volume report to Contractor broken down by account.

### Compensation

Contractor will be compensated as follows:

CONFIDENTIAL                                                                                       SUMMIT-000800

Client agrees to pay the amounts set forth in the table below from the gross revenue for all specimens received from Contractor, including, without limitation, amounts from reimbursements under all health care programs.

| Service: | Fee Per Service: |
|---|---|
| All testing | 18% of collected revenue |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

All fees will be paid on the 20th of each month and will be based on amounts actually received by Client. The monthly fees will be based on gross revenue received through the last working day of the previous month.

**Continuing Fees**

If Client terminates this Agreement for any reason (except for any of the Client Immediate Termination Bases), Client agrees to pay to Contractor service fees for a period of 12 months after the date of such termination.

The monthly fees during such 12-month period will based on the fees set forth in the table above for all specimens received from Contractor (in the case of pre-termination receivables) and all specimens received from Clients of Contractor during such 12-month period.

CONFIDENTIAL

SUMMIT-000801