UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

| | |
|---|---|
| SUMMIT DNA, LLC ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action 1:14-CV-1329 (WDQ) |
| vs. ) | |
| ) | |
| PROOVE BIOSCIENCES, INC. ) | |
| ) | |
| Defendant, ) | |
| ) | |
| BRIAN MESHKIN ) | |
| ) | |
| Defendant. ) | |
| _____) | |
| ) | |
| PROOVE BIOSCIENCES, INC. ) | |
| ) | |
| Counterclaim-Plaintiff ) | |
| and Third-Party Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| SUMMIT DNA, LLC ) | |
| ) | |
| Counterclaim-Defendant, ) | |
| ) | |
| GEORGE POWELL ) | |
| ) | |
| Third-Party Defendant. ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PROOVE BIOSCIENCES, INC. AND BRIAN MESHKIN'S
<u>MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

Defendant, Counterclaim-Plaintiff and Third-Party Plaintiff Proove Biosciences, Inc. ("Proove") and Defendant Brian Meshkin, by their undersigned attorneys and pursuant to Fed. R. Civ. P. 56 hereby file this Memorandum of Points and Authorities in support of their Motion for Partial Summary Judgment against Plaintiff/Counterclaim-Defendant Summit DNA, LLC ("Summit").

**INTRODUCTION**

Proove provides laboratory testing services to physicians to address the selection, dosing, and evaluation of pain medications they prescribe. The cutting edge tests identify a patient's risk for dependence, sensitivity, and misuse of pain medications, as well as how the patient will metabolize medications and whether the patient is complying with a doctor's orders. Brian Meshkin is Proove's President. Summit is a consulting company in New Hampshire that contracts with physicians who prescribe controlled substances such as pain medications. Summit also provides other consulting services and regulatory compliance services in the medical field. Summit and Proove contracted in an attempt to synergize Summit's purported relationships with physicians who may be interested in Proove's services. George Powell is Summit's president.

Proove and Summit entered into a written contract whereby Summit would receive a 10% commission on accounts referred to Proove. The contract, however, expressly provided that Summit "shall not" represent Proove's competitors in the Conflict of Interest section. In an attempt to elide this provision, Summit shifted its corporate forms to obscure the fact that it was actively representing two of Proove's competitors. When Proove found out that Summit was representing two of its competitors, Proove terminated the contract due to Summit's breach.

No material facts are in dispute. Summit breached the contract by representing Proove's competitors. Accordingly, summary judgment should be entered on liability pursuant to Proove's breach of contract claim. Summit's breach of contract claim fails as a matter of law because Summit undisputedly breached the contract and is therefore precluded from recovery. Summit's defamation claim cannot be sustained as a matter of law on this factual record and should be dismissed. Finally, Summit's claim for declaratory judgment should be dismissed due to the absence of a justiciable controversy.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.   On or about March 8, 2013, Summit and Proove entered into a written contractual agreement ("Contract").[1]

2.   The Contract contains the following terms:

**Conflict of Interest: [Summit] shall not represent any individual or company directly or indirectly competing with [Proove]** by offering same or similar Service(s) during the term of this Agreement and in accordance with the Confidential Information, Trade Secrets and Competition provision in this Agreement.[2]

[Summit] shall be solely responsible for ensuring **any employees or independent representatives of [Summit] comply with the terms of this Agreement**.[3]

**Term of Agreement:** this Agreement shall commence on the Effective Date and shall continue for one year (1) period and continuously thereafter for any number of subsequent one (a) year extensions, unless or until cancelled or terminated with or without cause, as defined below, by written Notice in accordance with the Notice(s) section in this Agreement.[4]

Termination: …If [Summit] is in breach of this Agreement or not complying with **the provisions mentioned in this section [including the Conflict of Interest clause], after the 15 day cure period, [Proove] will have no obligation to continue to pay [Summit] any commissions**.[5]

The Recitals section and descriptive headings of this Agreement are inserted for convenience of reference only and shall not be deemed to limit or to otherwise affect the scope, intent, or construction of any of its provisions.[6]

The terms of this Agreement have been negotiated by both parties hereto and the language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their mutual intent.[7]

Each party and/or their counsel have participated fully in the construction and review of this Agreement. Any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not apply in the interpretation of

---

[1] Ex. A (Contract).
[2] *Id.* at 4 (emphasis added).
[3] *Id.* at 3 (emphasis added).
[4] *Id.* at 1 (emphasis in original).
[5] *Id.* at 4 (emphasis added).
[6] *Id.* at 7.
[7] *Id.*

this agreement and both parties had an equal opportunity to negotiate the terms and provisions of this Agreement.[8]

**Entire Agreement:** This Agreement and any attachment contains the entire Agreement with respect to the subject matter hereof and supersedes all prior written, oral or implied agreements between the parties. No amendment or modification of this Agreement or its attachment shall be effective unless in writing and signed by all parties unless otherwise stated in this Agreement or attachment.[9]

3. Powell is Summit's owner and officer, and Powell is the person who signed the Contract with Proove on behalf of Summit.[10]

4. From the same location as Summit, Powell also owns and operates a company called Summit Diagnostics, LLC ("Summit Diagnostics").[11]

5. Summit and Summit Diagnostics share the same owner, management team, office space, personnel, resources, administrative staff, email addresses, telephone number, power, lighting, electricity, parking lot, utilities, and at multiple salespeople who sold Proove's products and services.[12]

6. Powell did not tell Proove that there were apparently two different Summit companies; Christine Ready, who has worked in the Summit/Summit Diagnostics offices for over six years, testified that she has never heard any person say that there are two Summit companies.[13]

---

[8] *Id.* at 8.
[9] *Id.* at 5 (emphasis in original).
[10] Ex. B (Powell Dep.) at 134:4-8; 152:17-153:8; 315:21-22; 426:19-24.
[11] *Id.* at 50:18-19; 59:8-12; 69:4-20.
[12] *Id.* at 78:15-20; 96:5-97:1; 114:15-24; 115:1-3; 135:21-24; 136:1-137:19; 353:23-354:3. Ex. C (Ready Dep.) at 7:2-8:16.
[13] Ex. B at 355:10-356:18; Ex. C at 9:22-10:10.

7.     Both Summit and Summit Diagnostics are engaged in DNA work, both Summit and Summit Diagnostics were involved with Proove and Powell conducts work for both Summit and Summit Diagnostics; he owns and manages both companies.[14]

8.     Powell's wife, Lori Powell, also works in management for both Summit and Summit Diagnostics.[15]

9.     Multiple salespeople carried dual roles working for both Summit and Summit Diagnostics.[16]

10.    As set forth in the Contract, "[Summit] shall be solely responsible for ensuring any employees or independent representatives of [Summit] comply with the terms of this Agreement;"[17] this provision applies to "any of the folks that were working for both Summit Diagnostics and Summit" and Summit is "responsible for ensuring" that "folks that were working for both Summit Diagnostics and Summit…comply with the terms of this Agreement."[18]

11.    On March 26, 2013, on behalf of Summit Diagnostics, Carolise Belmont welcomed Proove as the Summit Diagnostics new DNA lab partner, stating "we [Summit Diagnostics] have partnered with a new DNA lab, Proove Biosciences."[19]

12.    On behalf of Summit Diagnostics, with Powell copied, Belmont made the following statement in the Proove introduction email: "If you have any questions or need help

---

[14] Ex. B at 96:5-97:17; 135:3-15; 224:6-9; 284:15-18; Ex. D (Mar. 26, 2013 email).
[15] Ex. B at 348:22-349:5.
[16] Id. at 84:6-88:23; 108:8-109:15.
[17] Ex. A at 3.
[18] Ex. B at 84:6-88:23; 108:8-109:15; 156:6-21.
[19] Ex. D.

5

selling a [Proove] DNA account, please feel free to contact me or your manager, Sincerely, Carolise Belmont, Summit Diagnostics."[20]

13. Summit's role is to "close the deal" for Summit Diagnostics, and for all of the contracts that Summit Diagnostics had that involved DNA, the deals can't be closed unless Summit comes in and closes the deal.[21]

14. American International Biotechnology ("AI Biotech") is one of Proove's competitors in the DNA space, and AI Biotech provides the same or similar services as Proove.[22]

15. Beginning in 2012, Summit and/or Summit Diagnostics represented AI Biotech and received money from AI Biotech.[23]

16. Genomind, Inc. ("Genomind") is one of Proove's competitors in the DNA space, and Genomind provides the same or similar services as Proove.[24]

17. In July 2013, during the term of Summit's Contract with Proove, Powell signed a contract on behalf of Summit and/or Summit Diagnostics with Genomind and received money from Genomind.[25]

18. Proove discovered that Summit and/or Summit Diagnostics were marketing and promoting AI Biotech on December 17, 2013, during the term of Summit's Contract with Proove.[26]

---

[20] *Id.*
[21] Ex. B at 202:8-203:17.
[22] *Id.* at 162:2-163:6; 172:6-21.
[23] *Id.* at 91:3-7; 93:17-19; 97:14-16; 148:15-17; 218:6-220:1; 281:11-22; Ex. E (Summit emails with AI Biotech); Ex. C at 8:24-9:3.
[24] Ex. B at 162:2-163:6; 172:6-21; Ex. F (Meshkin Dep.) 36:19-38:9.
[25] Ex. B at 220:2-23; 223:13-14; 235:20-22; 246:22-248:3; 281:14-22; Ex. G (Summit Diagnostics contract with Genomind); Ex. C at 9:4-8.
[26] Ex. H (December 16, 2013 email).

19. Belmont, who had introduced Proove as the Summit Diagnostics new partner six months earlier on March 26, 2013, with Powell copied, now promoted AI Biotech, with Powell copied, as the Summit Diagnostics new partner on December 17, 2013.[27]

20. Proove discovered that Summit and/or Summit Diagnostics, directly through Powell with Lori Powell copied, had continued to market and promote AI Biotech on February 23, 2014, during the term of Summit's Contract with Proove.[28]

21. Proove discovered that Summit and/or Summit Diagnostics had continued to market and promote Genomind on February 24, 2014, during the term of Summit's Contract with Proove.[29]

22. Belmont, who had introduced Proove as the Summit Diagnostics new partner 11 months before on March 26, 2013, with Powell copied, was now marketing and promoting Genomind and scheduling the "next Genomind training session" for February 24, 2014.[30]

23. On March 24, 2014, Proove terminated the Contract with Summit, for cause, due to Summit's breach of the Conflict of Interest provision, stating in part:

> It has regrettably come to [Proove's] attention during the week of March 3, 2014 that Summit Diagnostics has been in breach of its contract with Proove since December 17, 2013.
>
> We have been provided documentation from multiple sources distributed by you to your sales team that outlines your Molecular Training Call on Tuesday, December 17th at 11 am eastern time and another call on Monday, February 24th 2014 at 4 pm in which you are repeatedly violating your contract with [Proove], specifically the provision on Conflict of Interest.
>
> [Proove] hereby effectively is terminating its contract with Summit and will explore legal action to recoup funds paid to Summit subsequent to the documented material breach amounting to over $75,000, plus damages.[31]

---

[27] Ex. D; Ex. G.
[28] Ex. I (February 23, 2014 email).
[29] Ex. B at 353:15-22; Ex. J (February 20, 2014 email and website).
[30] Ex. D; Ex. B at 353:15-22; Ex. J.

7

24. On March 28, 2014, Proove sent an email to Dr. Stephen Barrett, a podiatrist in Arizona, who was a small client [$5,000 total over three years][32] of both Proove and Summit,[33] and the email provided in relevant part:

> [I]t has come to our attention from multiple representatives of Summit Diagnostics that Summit has been marketing AI biotech and Genomind genetic testing – which is an overt breach of our Conflict of Interest provision in Summit's contract with Proove.
>
> Thus, we have terminated our contract with Summit Diagnostics and are seeking legal action on related damages.[34]

25. Summit and Powell admit that it is "absolutely true" that Summit Diagnostics had been marketing AI Biotech and Genomind genetic testing.[35]

26. Summit and Powell admit that it is a "true statement" that Proove has "terminated our contract."[36]

27. Summit and Powell admit that they received a letter [dated March 24, 2014] from Proove regarding exploration of legal action.[37]

28. The only information that Summit and Powell assert is untrue in the March 28, 2014 email is whether, as Powell says: "I breached my contract."[38]

29. Powell met Dr. Barrett less than a year before the March 28, 2014 email while Powell was "marketing Proove products,"[39] Powell knows Dr. Barrett "very well," Dr. Barrett is

---

[31] Ex. B at 296:9-297:3; Ex. K (March 24, 2014 letter).
[32] *Id.* at 295:10-296:4.
[33] *Id.* at 295:21-296:4.
[34] Ex. L (March 28, 2014 email).
[35] Ex. B at 281:11-22; 293:2-8.
[36] *Id.* at 297:1-3.
[37] *Id.* at 297:8-10.
[38] *Id.* at 281:11-282:5; 293:2-8; 297:1-3; 297:8-10.
[39] *Id.* at 284:15-18.

Powell's friend, they have spoken within the past six months to a year, and Dr. Barrett is still Powell's friend.[40]

30. After learning of the March 28, 2014 email, Powell called Dr. Barrett on the telephone and stated that "if anybody would have been in breach, it would been them [Proove]" thereby stating "the same thing to Dr. Barrett that Mr. Meshkin said to Dr. Barrett."[41]

31. When asked if he has ever said anything bad about Proove, Powell stated "I probably have."[42]

32. Actions taken by Meshkin in this case were in his corporate capacity on behalf of Proove and not in his individual capacity.[43]

## LEGAL STANDARD

Pursuant to Fed. R. of Civ. P. 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." When a plaintiff "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, . . . Rule 56(c) mandates the entry of summary judgment." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The mere existence of a factual dispute is insufficient to defeat a motion for summary judgment unless the dispute is over a genuine issue is of a "material" fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "Material facts are those that 'might affect the outcome of the suit under the governing law.'" *Id*. at 248. Here, summary judgment should be granted because there is no dispute over any fact that would affect

---

[40] *Id*. at 282:17-19; 283:8-15.
[41] *Id*. at 300:4-19; 325:15-22.
[42] *Id*. at 324:10-12.
[43] Ex. F at 21:2-9.

the outcome of Count V of the Counterclaim and Counts I, II and III of the First Amended Complaint.

## ARGUMENT

I. **Summary Judgment on Count V of the Counterclaim Should be Granted for Proove Because Summit Breached the Contract's Conflict of Interest Provision.**

To prove a breach of contract, the claimant must show that the defendant (1) owed the claimant a contractual obligation, and (2) that the defendant breached that obligation. *Taylor v. NationsBank, N.A.*, 365 Md. 166 (2001). Contracts are construed in their entirety and "effect must be given to each clause" so that a court will not find an interpretation which casts out or disregards a meaningful part of the contract. *Calomiris v. Woods*, 353 Md. 425, 441 (1999); *Sagner v. Glenangus Farms, Inc.*, 234 Md. 156, 167 (1964) (courts should avoid interpreting contracts so as to nullify their express terms). The parol evidence rule bars introduction of extrinsic evidence to vary or contradict the terms of a written contract. *Markoff v. Kreiner*, 180 Md. 150, 158 (1941). Under the parol evidence rule, a written agreement discharges prior agreements and discussions, thereby rendering alleged communications leading up to the written contract "legally inoperative." *Calomiris*, 353 Md. at 432.

The integrated Contract's Conflict of Interest provision unambiguously established Summit's obligation to refrain from representing Proove's competitors: "[Summit] shall not represent any individual or company directly or indirectly competing with [Proove]." The Contract further provided that "[Summit] shall be solely responsible for ensuring any employees or independent representatives of [Summit] comply with the terms of this Agreement." The plain language of this clause extends the reach of the Contract to "any employees or independent representatives" of Summit. Powell clearly qualifies as at least a "representative" of Summit, given that Powell is the company's owner and manager. Carolise Belmont set up trainings for all

10

y

three competitor DNA labs, Proove, AI Biotech and Genomind. At a minimum, Belmont is also a "representative" of Summit considering Belmont's leadership role. Belmont organized the training on Proove's accounts: "If you have any questions or need help selling a [Proove] DNA account, please feel free to contact me." Yet, in violation of the Conflict of Interest provision, Belmont also set up training meetings with two of Proove's two competitors, AI Biotech and Genomind during the term of the Contract. These actions constitute a breach of contract.

Lori Powell worked on both Summit and Summit Diagnostic accounts she coordinated in promoting AI Biotech. Since Summit had no actual staff of its own, the Summit Diagnostics administrators processed Summit's accounts, handled specimens, answered phones, administered billing and performed other tasks as representatives of Summit. The Contract's prohibition on representation of Proove's competitors extends to actions taken by Powell, Belmont, Lori Powell, sales representatives, and Summit's administrative staff. Summit was obligated to enforce the Conflict of Interest provision on each person who was, at a minimum, a "representative" of Summit. But Summit did not comply with the Conflict of Interest provision because Powell, Lori Powell, Belmont, and others were actively involved in marketing, promoting and representing Proove's competitors.

This is undisputed. Summit's owner, Powell, conceded that it was "absolutely true" that Summit Diagnostics was representing AI Biotech and Genomind. Powell was personally and directly involved in the engagement and promotion of Proove *and* Proove's competitors, AI Biotech and Genomind. Powell signed the Proove contract, he signed the Genomind contract and he personally interfaced in the AI Biotech engagement. Moreover, Lori Powell, who works for both Summit and Summit Diagnostics, was also involved in the AI Biotech engagement. Powell and Lori Powell were also directly involved in the marketing of AI Biotech and Genomind during the term of Summit's Contract with Proove. Belmont affirmatively marketed and

promoted all three companies, Proove, AI Biotech and Genomind. Because Powell, Lori Powell and Belmont are at a bare minimum "representatives" of Summit, considering that the three of them basically run the company, the Contract's prohibition on representation of Proove's competitors extends to actions taken by Powell, Lori Powell and Belmont. The actions Powell, Lori Powell and Belmont took in representing AI Biotech and Genomind were a breach of contract because the Conflict of Interest provision applies to all persons who are "representatives" of Summit. Accordingly, because no material facts are in dispute regarding Summit's breach of contract, summary judgment on Count V of the Counterclaim should be granted.

> II. **Summary Judgment on Count I of the First Amended Complaint Should be Granted in Proove's Favor Because Summit Did not Perform its Contractual Obligations.**

A Court may "refuse to allow recovery by either party to an agreement because of their mutual fault, which in contract terms might be properly described as mutual default." *Westinghouse Elec. Corp. v. Garrett Corp.*, 601 F. 2d 155, 157-58 (4th Cir. 1979); *Automotive Devices Co. v. Automotive Devices Co. of PA.*, 292 F. 2d 663, 665 (3rd Cir. 1961) (all contract relief denied to both parties who committed a material breach). As discussed in Section I above and incorporated by reference herein, Summit undisputedly breached the Conflict of Interest provision of the Contract. Undisputed evidence demonstrates that Powell, Lori Powell and Belmont represented AI Biotech and Genomind, Proove's competitors during the pendency of Proove's contract. The Contract's terms extend to Summit's "employees or independent representatives." As Summit's owner and primary operator, Powell easily qualifies as at least an "independent representative." Lori Powell and Belmont also qualify at least an "independent representatives" given their positions of authority and leadership. No genuine dispute of material fact exists regarding Summit's breach of the Contract. Because the evidence undisputedly shows

that Summit breached the contract, summary judgment should be granted in Proove's favor on Summit's breach of contract claim.

> **III. Count II of the First Amended Complaint Should be Dismissed Because No Justiciable Controversy Exists with Respect to the First Amended Complaint.**

If the Court dismisses Counts I and III, which are the only remaining counts in the First Amended Complaint, Summit's claim for declaratory judgment should also be dismissed. *See Boyds Civic Ass'n v. Montgomery County Council*, 309 Md. 683, 689 (1987) (dismissal is proper in the absence of a justiciable controversy because the existence of a justiciable controversy "is an absolute prerequisite to the maintenance of a declaratory judgment action.") Addressing non-justiciable issues would place courts in the position of rendering purely advisory opinions, a long forbidden practice in this State. *120 W. Fayette St., LLLP v. Mayor & City Council of Balt. City*, 413 Md. 309, 356 (2010).

> **IV. Summary Judgment on Count III of the First Amended Complaint Should be Granted Because Summit Cannot Sustain a Defamation Claim on this Record as a Matter of Law.**

To establish a defamation claim, the plaintiff must allege specific facts establishing four elements: (1) the defendant made a defamatory statement to a third person; (2) the statement was false; (3) the defendant was legally at fault in making the statement; and, (4) the plaintiff suffered harm. *Piscatelli v. Van Smith*, 424 Md. 294, 306 (2012). A statement is "false" when the statement is "not substantially correct." *Id.* (*citing Batson v. Shiflett*, 325 Md. 684, 726 (1992)). The claimant has the burden of proving a defamatory statement's falsity. *See Jacron Sales Co. v. Sindorf*, 350 A.2d 688, 698 (Md. 1976); *Piracci v. Hearst Corp.*, 263 F. Supp. 511, 513 (D. Md. 1966).

The entirety of the purported defamatory email is as follows:

>[I]t has come to our attention from multiple representatives of Summit Diagnostics that Summit has been marketing AI biotech and Genomind genetic testing – which is an overt breach of our Conflict of Interest provision in Summit's contract with Proove.
>
>Thus, we have terminated our contract with Summit Diagnostics and are seeking legal action on related damages.[44]

No portion of the email is false, given that all parts of the email are at the very least "substantially correct." Summit does not dispute that the marketing of AI Biotech and Genomind "has come to Proove's attention." In fact, Summit admits that it is "absolutely true" that that Summit Diagnostics had been marketing AI Biotech and Genomind genetic testing. Moreover, four days before the email, Proove informed Summit that "[i]t has regrettably come to [Proove's] attention" that representation of AI Biotech and Genomind had been undertaken. Additionally, four days earlier, Proove provided the exact dates and details regarding the marketing of its competitors AI Biotech and Genomind that was undertaken by Summit's owner. Summit also admits that it received a letter four days earlier from Proove regarding the exploration of legal action: "[Proove]… will explore legal action to recoup funds paid to Summit subsequent to the documented material breach amounting to over $75,000, plus damages."[45] Thus it cannot be "false" that Proove is "seeking legal action on related damages." Furthermore, Summit concedes that Proove terminated the contract.

The only part of the email left to debate is Proove's assertion that Summit breached the Conflict of Interest provision. The Conflict of Interest provision proscribes representation of Proove's competitors, yet Summit admits that it is "absolutely true" that Summit Diagnostics had been marketing AI Biotech and Genomind. Moreover, there is no credible denial of the fact that AI Biotech and Genomind are Proove's competitors. Particularly in light of the provision that

---

[44] Ex. J.
[45] Ex B at 296:9-297:3; Ex. J.

applies the Contract to all Summit's representatives, including Powell, Lori Powell and Belmont, the evidence is overwhelming that Summit breached the contract by representing AI Biotech and Genomind. Moreover, it is impossible on this record for Summit to show that the statement, that it breached, was categorically false.

A "defamatory statement" is one that tends to expose a person to "public scorn, hatred, contempt, or ridicule," which, as a consequence, discourages "others in the community from having a good opinion of, or associating with, that person." *Piscatelli*, 424 Md. at 306 (citing *Indep. Newspapers, Inc. v. Brodie*, 407 Md. 415, 441 (2009)) (emphasis added). "The threshold question of whether a publication is defamatory in and of itself, or whether, in light of the extrinsic facts, it is reasonably capable of a defamatory interpretation is for the court upon reviewing the statement as a whole; words have different meanings depending on the context in which they are used and a meaning not warranted by the whole publication should not be imputed." *Batson*, 325 Md. at 726.

In addition to the fact that all the statements in the email were at least substantially true, facts regarding the context of the email and relationship of the parties defeat any reasonable interpretation that the email is defamatory. To begin, the recipient is a *mutual client* of both Proove and Summit. Because of the joint business relationship, it was necessary for either Proove or Summit to inform Dr. Barrett of the contract's termination. Immediately after the email was received, Powell made virtually the same statement to Dr. Barrett that Proove made, stating that "if anybody would have been in breach, it would been them [Proove]."[46] Moreover,

---

[46] The corporate nature of the communications whereby two company presidents contemporaneously inform their mutual client of the termination of their contract diminishes an argument that Meshkin should be held personally liable. Moreover, unlike Powell who is operating unusual and marginal corporate forms, the facts in the record demonstrate that Meshkin adhered to traditional corporate formalities in the course of the Proove's management.

Powell first met Dr. Barrett while marketing Proove's products and had known Dr. Barrett for less than a year at the time of the statement. Following the statement, no scorn has resulted. Quite the opposite, despite the fact that Dr. Barrett was Proove's client as well as Summit's client, Powell's friendship with Dr. Barrett has persisted.  No evidence indicates that the email sent has discouraged Dr. Barrett from "associating with" Summit. To the contrary, their communications have continued within the past six months to a year, despite the fact that they do not conduct business together. On the other hand, no evidence indicates that Proove and Dr. Barrett have remained in communication after Powell told Dr. Barrett that "if anybody would have been in breach, it would been them [Proove]." When asked if he has ever said anything bad about Proove, Powell stated "I probably have." Because the facts extinguish any reasonable interpretation that the email is defamatory as a matter of law, summary judgment should be granted in Proove and Meshkin's favor on the defamation claim.

## CONCLUSION

For the foregoing reasons, Proove and Meshkin respectfully request that this Court enter partial Summary Judgment in their favor and against Summit (i) Count V of the Counterclaim, (ii) Count I of the First Amended Complaint, (iii) Count II of the First Amended Complaint, and (iv) Count III of the First Amended Complaint.

## REQUEST FOR HEARING

Proove and Meshkin respectfully request a hearing with oral argument pursuant to Local Rule 105.6.

Respectfully submitted,

SHOOK, HARDY & BACON L.L.P.


By: /s/ Kenneth E. Chase
    Kenneth E. Chase (D. Md. Bar No. 18034)
    Shook, Hardy & Bacon, LLP
    1155 F Street NW, Suite 200
    Washington, DC 20004
    Telephone: (202) 783-8400
    Facsimile: (202) 783-4211
    Email: kchase@shb.com

    Michael A. Zito
    Admitted *Pro Hac Vice*
    Shook, Hardy & Bacon L.L.P.
    1155 F Street NW, Suite 200
    Washington, DC 20004
    Telephone: (202) 783-8400
    Facsimile: (202) 783-4211
    Email: mzito@shb.com


    *Counsel for Defendant,*
    *Counterclaim-Plaintiff*
    *and Third-Party Plaintiff*
    *Proove Biosciences, Inc.*
    *and Defendant Brian Meshkin*

## **CERTIFICATE OF SERVICE**

I certify that on February 26, the foregoing was served on the following counsel of record by U.S. or electronic mail.

Joseph D. Edmondson, Jr.
Foley & Lardner, LLP
3000 K Street NW, Suite 600
Washington, DC 20007
jedmondson@foley.com

Lauren Champaign
Foley & Lardner, LLP
3000 K Street NW, Suite 600
Washington, DC 20007
lchampaign@foley.com

Phillip B. Toutant
The Health Law Partners, P.C.
29566 Northwestern Highway, Suite 200
Southfield, MI 48034
ptoutant@thehlp.com

Tim Burkhard
The Health Law Partners, P.C.
29566 Northwestern Highway, Suite 200
Southfield, MI 48034
tburkhard@thehlp.com

                                                By: /s/ Kenneth E. Chase
                                                    Kenneth E. Chase